[Crim. No. 22273. Aug. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN LEROY SMITH, Defendant and Appellant.

252

COUNSEL

John M. Bishop, under appointment by the Supreme Court, for Defendant and Appellant.

Quin Denvir, State Public Defender, Alice V. Collins, Harriet Wiss Hirsch and Jean R. Sternberg, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein and Edward P. O'Brien, Assistant Attorneys General, Ronald E. Niver, David D. Salmon and John W. Runde, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant appeals from a judgment convicting him of one count of robbery. He principally contends that the trial court erred in denying his motion to suppress his confession on the ground that it was obtained in violation of the privilege against self-incrimination guaranteed by article I, section 15, of the California Constitution. As will appear, we conclude that the contention is meritorious and the judgment must therefore be reversed.

In mid-November 1979 Edwin Meares[1] was 68 years old and lived in a trailer park in San Pablo, Contra Costa County; defendant was a young man of no fixed abode. They first met when defendant was hitchhiking and Meares picked him up twice in one day. On the second occasion defendant

---

[1]Although the name is written "Mears" in the trial transcript, when the witness testified at the preliminary hearing he spelled his own name as "Meares."

said he had been up all night and had no place to take a shower. Meares replied that he lived alone, and offered him the use of his trailer. Defendant accepted and became his houseguest.

For a week or 10 days all went well. Defendant and Meares shared their meals, watched television, and attended a drive-in movie together; they also went shopping together, and Meares bought defendant a pair of shoes. Trouble arose, however, over the use of the Meares car, a late-model Buick Regal. Meares allowed defendant to borrow the car almost every day; he later testified that defendant "seemed to have an inordinant [sic] love for it." Unfortunately defendant did not always take the car where he said he would or return it when promised, and the discrepancies began to bother Meares.

Matters came to a head on November 20, 1979, when defendant told Meares he was going to a drugstore but went to a park instead. When he brought the car back, an argument ensued and defendant asked, "Would you rather I go?" Meares replied, "Yes, I think it would be better," and defendant left the trailer. He returned early that evening, however, assertedly for some clothes he had left behind. After renewed discussion defendant pointed a knife at Meares and said, "I want your car," demanding that Meares turn over the keys and registration papers for the vehicle. Defendant then bound and gagged Meares with some clothing, and left with his host's wallet, credit card, checkbook, and a few other small items. Meares summoned help from a neighbor, and was freed unharmed.

A few hours later—about 11 p.m.—Police Officer Tucker was on routine patrol in Vallejo, Solano County, when he observed defendant urinating against the side of a building in a supermarket parking lot. The only car in the lot was a Buick Regal backed into a nearby parking space, with a passenger sitting in the front seat. As Officer Tucker stepped out of his squad car defendant walked over to meet him. The officer asked defendant if he had any identification, and defendant replied he did not.

Officer Tucker next patted defendant's clothing for weapons, but found none. He did feel an object in defendant's right rear pants pocket, however, and from its shape he inferred it was a man's wallet. Without further ado Officer Tucker reached into the pocket, took out the wallet, and ordered defendant to open it. When defendant complied, the officer saw a credit card inside that he directed defendant to hand over. The card bore the name of Meares, although earlier in the questioning defendant had given the officer his true name of Kevin Smith. Because of this discrepancy Officer Tucker ran a radio check on the card and learned it was stolen. He placed defendant under arrest for possession of stolen property, then searched the

rest of the wallet; finding the Buick's registration, he learned by a second radio check that the car was also stolen.

Officer Tucker transported defendant to the Vallejo police station, intending to interrogate him about the stolen property. When defendant was advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 85 S.Ct. 1602, 10 A.L.R.3d 974], however, he declined to answer any questions. During the night defendant was moved to the Contra Costa County jail in Martinez. There he was interrogated about the robbery at some time between 9 and 10 o'clock the next morning by Sergeant Hisey of the Contra Costa Sheriff's office. Defendant was again read his *Miranda* rights, and this time he confessed to the robbery. Sergeant Hisey later testified he had not been told that defendant had previously been given *Miranda* warnings and had refused to talk to the police.

At the outset of trial defendant moved to suppress on grounds of illegality (1) the evidence seized in the parking lot by Officer Tucker and (2) the confession obtained at the county jail by Officer Hisey. The court granted the motion in part, ruling that the search of defendant's wallet was unlawful; accordingly, it ordered that evidence of the stolen credit card, registration certificate, and Buick automobile be suppressed as fruits of the search. The court denied the motion as to the confession, however, and Officer Hisey was allowed to testify to its contents.

I

As a preliminary matter, we take up the question of the law governing this appeal. After we granted a hearing in this case, the voters adopted an initiative measure at the June 1982 Primary Election designated on the ballot as Proposition 8. It took effect on the day after the election, i.e., on June 9, 1982. (Cal. Const., art. XVIII, § 4.) The initiative made a number of changes in the constitutional and statutory law of this state governing criminal prosecutions. In particular, section 3 of the initiative added new section 28 to article I of the Constitution, and subdivision (d) of that section declares in pertinent part that "relevant evidence shall not be excluded in any criminal proceeding."[2]

---

[2]The provision, hereinafter referred to as section 28(d), reads in its entirety as follows: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

Proposition 8 is reprinted in full in the appendix to *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 300-301 [186 Cal.Rptr. 30, 651 P.2d 274].

■ Shortly after the election, the Attorney General filed a supplemental brief contending that section 28 (d) governs this case and all other criminal appeals pending when it was adopted. Reply briefs were filed by defendant and by the State Public Defender as amicus curiae, contending that not only section 28 (d) but Proposition 8 as a whole is inapplicable to pending appeals, and indeed to any case in which the crime occurred before the proposition took effect. The Attorney General filed a detailed responsive brief. The issue was thus joined, and has been orally argued before this court. In *Brosnahan* v. *Brown* (1982) *supra,* 32 Cal.3d 236, we exercised our original jurisdiction to review by writ certain challenges to the validity of Proposition 8 because "the issues are of great public importance and should be resolved promptly." (*Id.* at p. 241.) The issue here raised by the parties— i.e., to which cases does Proposition 8 apply?— is no less important and urgent to the profession and the public at large. In view of all these circumstances, it is appropriate that we address the question in the case at hand. ■ We shall hold that Proposition 8 applies only to prosecutions for crimes committed on or after its effective date.

We reach this conclusion for three reasons. First, the primary stated purpose of Proposition 8 is to deter the commission of crimes. Subdivision (a) of new section 28, article I, of the Constitution, added by section 3 of Proposition 8, is a legislative declaration of intent that evidently speaks for the proposition as a whole. In its first three paragraphs it lists certain rights of personal security that the proposition is designed to protect; in particular, the second paragraph emphasizes "the more basic expectation that persons who commit felonious acts causing injury to innocent victims will be appropriately detained in custody, tried by the courts, and sufficiently punished *so that the public safety is protected and encouraged as a goal of highest importance.*" (Italics added.) And the fourth paragraph recites that "To accomplish these goals, broad reforms in the procedural treatment of accused persons and the disposition and sentencing of convicted persons are necessary and proper *as deterrents to criminal behavior and to serious disruption of people's lives.*" (Italics added.)

It is obvious that no such reform, no matter how effective, can deter criminal behavior or avert disruption of life if that behavior or disruption has already taken place. Not even a unanimous vote of the people could have turned back the clock and prevented crimes that had previously been committed; we cannot ascribe so irrational a hope to the electorate. Accordingly, by declaring the purpose of Proposition 8 to be the deterrence of crime the voters must have intended the measure to apply only to offenses

that *could* be deterred, i.e., that had not already been committed by the time Proposition 8 was adopted.[3]

■ Our second reason for so viewing Proposition 8 flows from the fundamental principle that if reasonably possible the courts must construe a statute to avoid doubts as to its constitutionality. (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; accord, *People* v. *Roder* (1983) 33 Cal.3d 491, 505 [189 Cal.Rptr. 501, 658 P.2d 1302]; *People* v. *Black* (1982) 32 Cal.3d 1, 10 [184 Cal.Rptr. 454, 648 P.2d 104]; *Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853], and cases cited.) The same principle governs construction of a provision of the California Constitution. (*Otsuka* v. *Hite* (1966) 64 Cal.2d 596, 606-607 [51 Cal.Rptr. 284, 414 P.2d 412].) And it governs in either case even though the measure was adopted by vote of the people, "because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." (*Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 295 [70 L.Ed.2d 492, 498, 102 S.Ct. 434].)

■ In the present context, the potential constitutional defect in Proposition 8 is that if construed to apply to crimes committed before its adoption, it may amount to an ex post facto law. Our state Constitution, upon which we rely, prohibits such laws. (Cal. Const., art. I, § 9.) The general guidelines for enforcing the ex post facto prohibition are well known, but its specific applications may present difficult questions.

■ Thus it is commonly said that for a law to be ex post facto "it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (Fns. omitted.) (*Weaver* v. *Graham* (1981) 450 U.S. 24, 29 [67 L.Ed.2d 17, 23, 101 S.Ct. 960].) The latter phrase plainly includes any law that punishes as criminal an act that was innocent when done, or increases the punishment for a crime after it was committed. (*Id.* at p. 28 [67 L.Ed.2d at p. 22].)

Beyond these two manifest constraints, the picture is much less clear. ■ ■ ■ ■ To begin with, no guidance can be found in the concept of vested rights, as it is now settled that "a law need not impair a 'vested right' to violate the *ex post facto* prohibition." (*Id.* at p. 29 [67

---

[3] A contrary inference is not compelled by the fact that section 28 (d) speaks of applying to "any criminal proceeding." (See fn. 2, *ante.*) When read in context—i.e., relevant evidence shall not be excluded "in any criminal proceeding, including pretrial and post conviction motions and hearings"—the phrase is plainly meant to ensure that section 28 (d) will operate not only in criminal *trials* but also in other stages of a prosecution in which evidence is offered, such as preliminary examinations, hearings on motions to set aside accusatory pleadings or suppress evidence, and sentencing proceedings. In addition, of course, the phrase serves the purpose of excluding civil cases from the scope of section 28 (d).

L.Ed.2d at p. 23].)[4] ▉ Somewhat more helpful is the procedural-substantive distinction, but even that traditional tool must be used with great care in this context: "Changes which may be designated as procedural do not, as a rule, come within the ex post facto doctrine, but that in itself is not the true test." (*People* v. *Ward* (1958) 50 Cal.2d 702, 707 [328 P.2d 777], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) Likewise, the United States Supreme Court recently reiterated in *Weaver* that "no *ex post facto* violation occurs if the change effected is merely procedural" (450 U.S. at p. 29, fn. 12 [67 L.Ed.2d at p. 23]), but immediately qualified the rule by the caveat that "Alteration of a substantial right, however, is not merely procedural, even if the statute takes a seemingly procedural form." (*Ibid.*) This is because "it is the effect, not the form, of the law that determines whether it is *ex post facto.*" (*Id.* at p. 31 [67 L.Ed.2d at p. 31].) Yet the high court did not undertake to define what is a "substantial right" for this purpose, less still to prepare an inclusive list of such rights.[5]

As to all but the most obvious examples of ex post facto legislation, in short, the general rule is that there is no general rule. ▉ Each new statute challenged on this ground must be individually weighed in the constitutional scales, in the context of a specific case, and the outcome will often depend on matters of degree—e.g., on how substantial is the right that the statute impairs and how significant is that impairment. Plainly these are questions on which reasonable judges may differ. Indeed, in close cases the decision will inevitably turn on such subtle factors as the court's sense of fair play and justice.

▉ This task is difficult enough to perform with consistency when, as usually occurs, the Legislature adopts one statute at a time or a multisection act that is either all "substantive" or all "procedural." It is even more problematic when the legislation is a seemingly random mixture of provisions of both kinds. Viewed functionally, Proposition 8 is such a composite. It is true that in *Brosnahan* the court held that Proposition 8 deals generally with a "single subject" within the meaning of article II, section 8, subdivision (d), of the Constitution,[6] and defined that subject as "promoting the

---

[4]"When a court engages in *ex post facto* analysis, which is concerned solely with whether a statute assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred, it is irrelevant whether the statutory change touches any vested rights." (*Id.* at p. 30, fn. 13 [67 L.Ed.2d at p. 23].)

[5]A few kinds of statutes, even though procedural in appearance, have consistently been held subject to the ex post facto clause because of their substantial effect on a defendant's rights: e.g., statutes deleting elements of the crime, lowering the prosecution's burden of proof, or impairing a defense.

[6]"An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."

rights of actual or potential crime victims." (32 Cal.3d at p. 247.) But the opinion did not address the question now before us, and repeatedly cautioned that it was not meant to preclude subsequent inquiries into any other aspect of Proposition 8. (*Id.* at pp. 241, 242.)

We observed in *Brosnahan* that the 10 sections of the proposition were designed to strengthen both "procedural and substantive" safeguards for victims of crime. (*Id.* at p. 247.) When the measure is examined in light of our present concern, however, its provisions do not all divide neatly into one or the other of those categories. Thus some of the provisions of Proposition 8 are clearly substantive, and would be ex post facto if they were applied to crimes committed before the measure took effect. Prime among these is the clause adding five years to the sentence of anyone convicted of a "serious felony" with a prior conviction of such a crime (§ 5).[7] At the other end of the spectrum are provisions that are clearly procedural both in form and effect, and would not be ex post facto as to prior crimes. These include the clauses giving victims of crime a right to restitution (§ 3) and to appear at sentencing and parole hearings (§ 6), guaranteeing the "right to safe schools" (§ 3), and requiring a prior felony conviction to be proved in open court when it is an element of a charged felony (*ibid.*).

Between these two extremes, however, fall a number of other provisions of Proposition 8 that present a closer question: although procedural in outward form, it is possible that in a particular case each may affect rights of the defendant that are sufficiently "substantial" to require ex post facto protection. They include the clauses abolishing all limitations on the use of prior convictions against the defendant for either impeachment or enhancement of sentence (§ 3), modifying the defense of insanity (§ 4), restricting plea bargaining in certain prosecutions (§ 7), and barring commitment to the Youth Authority of any person convicted of certain crimes committed after the age of 17 (§ 8).

The difficulty presented by the latter group is epitomized by another of its members, i.e., the portion of section 3 which declares that "relevant evidence shall not be excluded in any criminal proceeding" (fn. 2, *ante*). Whether that clause is ex post facto as to prior crimes cannot be told in advance or in general terms; it will depend on the actual effect of the clause in a specific prosecution. For example, in a case in which the provision is found to result simply in broadening the kinds of evidence admissible or the class of persons competent to testify, it would probably not be ex post facto

---

[7] If the defense of diminished capacity survived in any respect the enactment of Penal Code section 28 in 1981 (Stats. 1981, ch. 404, § 4, p. 1592), its abolition by section 4 of Proposition 8 would also trigger ex post facto protection.

in operation. (*People* v. *Bradford* (1969) 70 Cal.2d 333, 343-344, fn. 5 [74 Cal.Rptr. 726, 450 P.2d 46] [dictum].) On the other hand, in any matter in which the clause is seen to have the effect of impairing a defense or "permitting a person to be convicted with less evidence than was required when the act was done" (*People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 472 [106 Cal.Rptr. 519] [dictum]), its application would appear to be barred by the ex post facto clause.

To avert these and like uncertainties, to minimize multiplicity of litigation, to forestall inconsistency of results in the inevitable close cases, and in general to avoid doubts as to the constitutionality of this measure under the ex post facto clause, we construe Proposition 8 to apply only to criminal proceedings arising out of offenses committed on or after the date it took effect. (See also *People* v. *Teron* (1979) 23 Cal.3d 103, 117-119 [151 Cal.Rptr. 633, 588 P.2d 773] [construing the 1977 death penalty legislation, which restored that penalty and provided elaborate procedures for its implementation, to apply only to crimes committed after its effective date].)

Finally, by so construing Proposition 8 we also avoid a number of practical consequences adverse to the administration of justice and the right of fair trial. Wherever a line is drawn, of course, some appearance of arbitrariness is inevitable the more closely one approaches it; courts should make every reasonable effort to curtail that effect by placing the line where it will have the least capricious results. Here, the dissent hypothesizes that if we draw the line in the case at bar at the date of the crime, as we do, a single search might disclose evidence of multiple crimes some of which were committed before June 9, 1982, and others after that date; the latter would therefore be governed by Proposition 8 but the former would not.

The dissent's hypothetical is highly unlikely to have occurred even once. By contrast, the line that the dissent would draw—i.e., the date of finality of the judgment—would be certain to result in many instances of no less apparent arbitrariness: all criminal appeals that happened to be still pending on June 9, 1982, would be governed by Proposition 8, but all such appeals that were decided in the days immediately preceding that date would not. Whether a defendant whose appeal was determined during that period obtained a reversal and a new trial would therefore often depend not on the merits of his appeal but merely on the dispatch with which the appellate court acted on his particular case.

Moreover, although Proposition 8 was presented as a measure designed to benefit the prosecution, at least section 28 (d) thereof is so broadly worded as to grant certain benefits to the defense as well: by declaring in neutral terms that "relevant evidence shall not be excluded in any criminal pro-

ceeding," the section appears to make admissible relevant but previously inadmissible evidence not only for the People but also for the defense. Yet the dissent's proposal would deny those benefits to all defendants—such as the defendant here—whose trials took place before June 9, 1982: although the Attorney General would be permitted to rely for an affirmance on prosecution evidence made retroactively admissible by Proposition 8, the defendant would be denied the opportunity to introduce defense evidence admissible under the same law. In appropriate circumstances, that denial could amount to a deprivation of due process.

The robbery in the case at bar was committed long before June 9, 1982. Accordingly, we review the merits of the appeal under the law of California as it stood at the time of that crime.[8]

## II

Defendant contends that the confession obtained by Sergeant Hisey in Contra Costa County on the morning after the arrest was inadmissible under our decision in *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]. The point is well taken.

In *Pettingill* Officer Berry of the Eureka Police Department arrested the defendant on a charge of committing a burglary in that city, read him his *Miranda* rights, and asked if he wanted to talk to the police. The defendant refused to do so, and was placed in city jail. Two hours later Officer Berry readvised the defendant of his *Miranda* rights and again invited him to make a statement; once more the defendant declined to talk, and was transferred to the county jail. Meanwhile, evidence found at the scene of the crime in Eureka connected the defendant with several recent burglaries in Santa Barbara. Two days later Detective Rogers of the Santa Barbara Police Department arrived in Eureka to investigate the latter offenses. The Eureka police turned over the suspicious evidence to him, and informed him that the defendant had twice refused to make a statement. On the following day Detective Rogers read the defendant his *Miranda* rights and asked if he wanted to talk about the Santa Barbara burglaries. This time the defendant confessed, and was charged with the Santa Barbara offenses. When his motion to suppress the confession was denied, he pleaded guilty and appealed.

We reversed the conviction, holding that the confession was obtained in violation of the privilege against self-incrimination guaranteed by article I, section 15, of the California Constitution. We first reviewed a long line of

---

[8]Because Proposition 8 is inapplicable to this case, we do not reach the parties' additional contentions as to its scope and validity.

California decisions beginning with *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], which held that once a suspect indicates he wishes to assert his privilege against self-incrimination, all police-initiated custodial interrogation must cease; any statement he makes thereafter in response to such interrogation is deemed involuntary, even if preceded by full *Miranda* warnings and waivers. (21 Cal.3d at pp. 238-241.)

We then rejected an attempt by the People to distinguish the foregoing precedents on two factual grounds, reasoning that the proposed distinctions were irrelevant to the purposes served by *Fioritto* and its progeny. Thus in *Pettingill* the interrogation that produced the confession did not immediately follow the defendant's assertion of his right to remain silent, but came three days later; we explained, however, that "the *Miranda-Fioritto* line of decisions is premised on the perception that 'the setting of in-custody interrogation' of a suspect without counsel is inherently coercive. That setting, with its subtle pressures of unfamiliar surroundings, physical and psychological isolation, and police-dominated atmosphere, remains the same whether the suspect is in custody for three hours or three days." (*Id.* at p. 242.)

Next, in *Pettingill* the final interrogation was conducted by an officer of another law enforcement agency and dealt with crimes different from those for which the defendant had been arrested and first questioned. We held that to draw a distinction on that ground would undermine the purpose of the *Fioritto* rule: "It might catch the occasional sophisticated criminal who wishes to make selective statements about certain charges to specified agencies; but it would do so at the cost of sweeping into its net the large majority of suspects who see the uniform only as a symbol of police authority, who neither know nor care about the precise jurisdictional competence of their interrogators, and who do not want to talk to any of them. Little would remain of the *Fioritto* rule if it could be evaded simply by sending in an officer from a different police or sheriff's department every time a suspect asserts his right to remain silent, or by changing the subject of the questioning from one of the crimes under investigation to another." (*Id.* at p. 245.)

Finally, in deciding this question of state constitutional law we declined to follow a United States Supreme Court decision on similar facts, *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], which held to the contrary under the federal privilege against self-incrimination of the Fifth Amendment. In *Mosley* the defendant was arrested for robbery and taken to the Detroit police station; advised of his *Miranda* rights, he refused to talk. Several hours later a different detective took the defendant to the homicide bureau in the same building, again gave him the *Miranda* warn-

ings, and sought to question him about an unrelated robbery-murder. In due course the defendant made a statement implicating himself in the latter crime, and the statement was used in convicting him of first degree murder. The United States Supreme Court rejected the view of the Michigan appellate court that once a suspect has asserted his right to remain silent any confession obtained by renewed police interrogation is per se inadmissible. Instead the court adopted a factual test, holding that the admissibility of such a confession turns on whether the suspect's *Miranda* right to cut off the questioning was respected in the totality of the circumstances. (*Id.* at p. 104 [46 L.Ed.2d at p. 321].) The court then found such a showing had been made in the case before it, and identified several "circumstances" in support: "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." (*Id.* at p. 106 [46 L.Ed.2d at p. 322].)

■ In determining the weight to be given to *Mosley* in this state, the *Pettingill* court invoked the settled doctrine that "decisions of the United States Supreme Court defining fundamental civil rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." (*People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) After such consideration, we concluded in *Pettingill* that the *Mosley* test provided less protection than California law in two respects: first, the "circumstances" stressed by the high court were "precisely the techniques—lengthy incommunicado detention and the switching of interrogators and charges—" that we found to endanger the suspect's privilege against self-incrimination under California law by increasing the pressures on him to confess. (21 Cal.3d at p. 249.) Second, and perhaps more important, because the totality-of-the-circumstances test of *Mosley* was unavoidably vague in its formulation and unpredictable in its results, we reasoned that to adopt it in California would lead to delays in criminal trials while the sufficiency of each "circumstance" was litigated, and to inconsistent rulings on similar facts; in turn, these effects would make it more difficult for the police to conform their conduct to constitutional standards, and would necessarily cause instances of individual injustice. (*Id.* at pp. 249-251.) For these reasons we concluded that "the *Fioritto* rule, rather than the *Mosley* test, will remain the rule of decision in all state prosecutions in California." (*Id.* at p. 251.)

■ In the case at bar, as in *Pettingill*, defendant was arrested for one offense (possession of stolen property) committed in one county (Solano); when a police officer from that county gave him *Miranda* warnings and

sought to question him about that offense, he asserted his right to remain silent; after defendant had been held in continuous custody for some 10 hours (compare *People* v. *Mack* (1980) 27 Cal.3d 145, 154 [165 Cal.Rptr. 113, 611 P.2d 454]), a police officer from a different county (Contra Costa) sought to question him about a different offense (robbery) committed in the latter county; he gave defendant *Miranda* warnings again, and this time defendant confessed. On essentially identical facts, *Pettingill* held such a confession inadmissible.

The Attorney General seizes on one factual difference between this case and *Pettingill,* and attempts to draw a distinction on that ground. Here Sergeant Hisey testified that at the time he renewed the interrogation he did not know that on the previous evening Officer Tucker had read defendant his *Miranda* rights and defendant had declined to answer any questions. On the face of our opinion in *Pettingill,* however, we considered this very fact and plainly indicated that it would amount to a distinction without a difference. Thus, in reviewing some of the questions left open by the ad hoc approach of *Mosley,* we pointed out that "In *Mosley* the record was 'not clear' as to what if anything the second detective knew about the first interrogation ([423 U.S.] at p. 105 [46 L.Ed.2d at p. 322]); will the confession be admissible when, as here, he is fully informed that the suspect was previously questioned and explicitly refused to waive his right to remain silent? Should it be admissible even if the second officer is ignorant of that fact?" (21 Cal.3d at pp. 249-250.) In a footnote at that point we answered the latter question as follows: " 'To say that ignorance of the second officer concerning the earlier interview shields the second interview from attack not only would open the door to evasions by the police but it ignores the reason for the *Fioritto* rule, which is to prevent the police from wearing down a prisoner's resistance by repeated pressuring until he finally makes the statement desired in order to get peace. That pressure exists whether or not the successive would-be interrogators are acting in concert for that purpose, or are acting independently—it is the effect on the prisoner that *Fioritto* seeks to avoid.' " (*Id.* at p. 250, fn. 11, quoting from *People* v. *Milton* (1969) 270 Cal.App.2d 408, 415-416 [75 Cal.Rptr. 803].)

While the foregoing passage from our *Pettingill* opinion was not strictly necessary to the decision, it was both relevant and deliberate; and its rejection of the hypothesized distinction was based on the same ground—i.e., to avoid frustrating the purposes of the *Miranda-Fioritto* rule—as our earlier rejection of the distinctions urged by the People (21 Cal.3d at pp. 242-245). Finally, as will appear, the view expressed in the quoted passage is consistent with the decided cases both before and after *Pettingill.*

Thus in the first decision to follow *Fioritto, People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the de-

fendant was arrested at the crime scene and given *Miranda* warnings. He replied, "Call my parents for my attorney," but the arresting officers neither complied with the request nor communicated it to their superiors. The defendant was transported to the police station, where a detective arrived half an hour later to interrogate him. The detective had not been informed of the defendant's request for his attorney. He proceeded to readvise the defendant of his *Miranda* rights, asked if he would talk, and obtained a confession. We held the confession inadmissible under the *Miranda-Fioritto* rule, reiterating that the requirement that police questioning must cease when the defendant asserts his privilege against self-incrimination is designed to dispel the inherently coercive nature of custodial interrogation. (*Id.* at p. 537.) We rejected as irrelevant the circumstance that the arresting officers had not informed the detective of the defendant's request for his attorney: "The fact that a failure of communication within the police department might have been at fault can have no effect upon our decision. Our concern lies with the fact that, for whatever reason, custodial interrogative processes *did not cease* upon assertion of the privilege." (Italics in original; *ibid.*, fn. 12.)

We quoted the latter reasoning in the next case in point, *People* v. *Randall* (1970) 1 Cal.3d 948, 957, footnote 10 [83 Cal.Rptr. 658, 464 P.2d 114], concluding that the fact that the officer who obtained the confession may not have known of the defendant's prior assertion of the privilege "will not excuse his subsequent questioning. . . . To hold otherwise would open the door to evasions by the police." (*Ibid.*)

More recently, in *People* v. *Borba* (1980) 110 Cal.App.3d 989 [168 Cal.Rptr. 305], the defendant was arrested for drunk driving at 11:30 p.m., and a booking search disclosed property in his possession linking him to a burglary earlier that evening. The arresting officer gave the defendant *Miranda* warnings and sought to question him about the drunk driving incident, but he declined to talk. At 8:30 the next morning a detective who was unaware that the defendant had invoked his *Miranda* rights readvised him of those rights, obtained a waiver, and questioned him about the burglary. The defendant admitted he knew the property was stolen, and his statement was used in convicting him of receiving such property.

The Court of Appeal reversed the judgment, holding that counsel's failure to object to the admission of the statement on *Pettingill* grounds deprived defendant of effective representation and withdrew a potentially meritorious defense. The court observed that the only meaningful distinction between *Pettingill* and the case before it was that the detective who obtained the confession was ignorant of the defendant's earlier refusal to talk to the arresting officer. For the reasons stated in the above-quoted footnote of

*Pettingill,* however, the court held this to be a distinction without a difference. (*Id.* at pp. 995-996.)[9]

The sole deviation from this line of authority is *People* v. *Lopez* (1979) 90 Cal.App.3d 711 [153 Cal.Rptr. 541], a case in which the Court of Appeal held a confession admissible on facts essentially identical to those at bar. Here the trial court based its ruling on *Lopez,* and the Attorney General naturally relies heavily on the decision. We are of the view, however, that *Lopez* misconstrues both the letter and spirit of *Pettingill* and its antecedents. *Lopez* begins by reading the *Pettingill* opinion in narrow and grudging fashion (*id.* at pp. 715-719), then proceeds to list five "factors" said to justify admitting the confession in question: (1) the interrogation that resulted in the confession was conducted by a different officer in a different place and on a different topic; (2) there was no showing of "police subterfuge"; (3) the second interrogation was not a "reinstitution" of the first; (4) the second *Miranda* warning was complete and correct; and (5) the second officer did not know that the defendant had previously exercised his *Miranda* rights. (*Id.* at pp. 719-720.)

The *Lopez* technique of deciding the admissibility of the confession by weighing such "factors," however, is in effect a return to the "totality of the circumstances" test of *Mosley*—a test we expressly declined to follow in *Pettingill*; and as we reaffirmed two years after *Lopez,* "*Pettingill* remains the law of California and we faithfully adhere to it." (*People* v. *Davis* (1981) 29 Cal.3d 814, 825 [176 Cal.Rptr. 521, 633 P.2d 186].)

Moreover, each of the factors stressed in *Lopez* has been rejected as irrelevant to the purposes of the *Miranda-Fioritto* rule in the cases we have reviewed above. In particular, the only arguable distinction between *Pettingill* and *Lopez* is the last factor listed in *Lopez,* i.e., that the second officer did not know the defendant had previously exercised his *Miranda* rights. Yet the issue is not the state of mind of the officer but of the prisoner. The *Miranda-Fioritto* rule is not designed to punish the police but to insure that any statement a prisoner makes while confined is a product of his free will rather than the inherent coerciveness of custodial interrogation. (*Pettingill,* at p. 237 of 21 Cal.3d.) Successive interrogations bring even more pressure to bear, and from the prisoner's viewpoint their cumulative effect is not lessened in the slightest merely because the second officer may be unaware that he already refused to talk. As the court correctly observed in *Borba* (110 Cal.App.3d at p. 996), "It is the fact of *custody* with its inherent

---

[9]On similar facts, the same result was reached without discussion in *In re Roland K.* (1978) 82 Cal.App.3d 295 [147 Cal.Rptr. 96]. There, too, the officer who obtained the confession on the morning after the arrest testified he did not know that the defendant had invoked his privilege against self-incrimination the night before. (*Id.* at p. 299.)

coercive ambience inducing a psychological compulsion to confess that underlies, from *Fioritto* on, the court's rule on continued police interrogation of a prisoner who has asserted his right to remain silent, not the knowledge of the police interrogator that the prisoner has invoked his privilege. It is for these reasons that we decline to follow *People* v. *Lopez, supra,* 90 Cal.App.3d 711." For the same reasons we disapprove *Lopez* insofar as it is inconsistent with the present decision.

Following *Pettingill,* accordingly, we conclude that the confession obtained by Officer Hisey after defendant exercised his right to remain silent was taken in violation of defendant's privilege against self-incrimination under article I, section 15, of the California Constitution and hence was inadmissible. Because the tainted confession was nevertheless introduced into evidence against him, the judgment must be reversed. (*Fioritto, supra,* at p. 720 of 68 Cal.2d, and cases cited.)

### III

For the guidance of the court on remand (Code Civ. Proc., § 43), we also address the Attorney General's contention that the court erred in ruling that the physical evidence seized in the parking lot by Officer Tucker was illegally obtained and therefore inadmissible. ■ The Attorney General is entitled to question that ruling in defending this appeal (Pen. Code, § 1252; *People* v. *Braeseke* (1979) 25 Cal.3d 691, 701, fn. 5 [159 Cal.Rptr. 684, 602 P.2d 384]); the difficulty is with the theory on which he does so.

At the hearing on the motion to suppress, the prosecutor expressly disclaimed any reliance on the theory that Officer Tucker had the right to remove the wallet from defendant's pocket during the patdown because it might have been or contained a weapon. (See *People* v. *Leib* (1976) 16 Cal.3d 869, 875-876 [129 Cal.Rptr. 433, 548 P.2d 1105], and cases cited.) Nor did the prosecutor contend the search was incidental to an arrest of defendant for any offense. Rather, he sought to justify the intrusion on a wholly different theory, i.e., that it was a so-called "accelerated booking search." The Attorney General, in turn, disavows the prosecutor's attempted justification and states flatly that "We disclaim reliance on an 'accelerated booking' theory of the instant case." Instead he proposes several further—and still different—theories to justify the intrusion. The theories all postulate that the search was incidental to an arrest of defendant for a misdemeanor, but they are at considerable variance over which misdemeanor defendant allegedly committed. Thus in his respondent's brief filed in the Court of Appeal the Attorney General argued that Officer Tucker was entitled to demand identification from defendant because he observed him violate Penal Code section 374b.5 (discarding litter on public or private prop-

erty), that the officer could infer the wallet in defendant's pocket contained such identification, that defendant's earlier denial that he had any identification thus constituted the additional misdemeanor of obstructing an officer in the discharge of his duty (Pen. Code, § 148), and that the search was incidental to an arrest for the latter offense.

In his response filed in this court to a brief of amicus curiae, however, the Attorney General has again shifted his ground, and now propounds an even more elaborate thesis. He argues first that Officer Tucker in fact arrested defendant for a violation of Penal Code section 375 (throwing or releasing an injurious or nauseous substance in a theater or other place of business or public assembly) and that the search was incidental to *that* arrest. Apparently recognizing that in a case of public urination it is unlikely that an officer would attempt to seize either the instrumentality used to commit the crime or the fruits thereof (*People* v. *Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807, 812 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), the Attorney General urges that any identifying documents on the person of the arrestee can nevertheless be seized and searched as "other evidence . . . which will aid in the apprehension or conviction of the criminal." (*Ibid.*) In the alternative, the Attorney General contends that Officer Tucker had probable cause to arrest defendant for the supposed misdemeanor of "wilfully failing to reveal documents of identification on his person when requested under appropriate circumstances by a peace officer," an offense that the Attorney General purports to find in the general statute prohibiting loitering. (Pen. Code, § 647, subd. (e).) The argument presumably is that in the case of that "offense" such documents of identification are themselves either instrumentalities or fruits of the crime and hence can be seized and searched as an incident to an arrest therefor.[10]

We need not reach the merits of any of the numerous imaginative theories offered to us in the Attorney General's protean presentation: the undeniable fact remains that none of these theories was raised at the suppression hearing. Indeed, to the extent it can be determined from the testimony it appears that the offense for which Officer Tucker in fact detained defendant was different yet again from any now relied on by the Attorney General: the officer agreed that he "had in mind" the statute prohibiting the dumping of waste matter on public or private property, which

---

[10]In fairness to the Attorney General, we note that his brief was written before the United States Supreme court struck down the cited loitering statute as unconstitutional. (*Lawson* v. *Kolender* (1983) — U.S. — [75 L.Ed.2d 903, 103 S.Ct. 1855].)

is Penal Code section 374b.[11] In these circumstances it is settled that none of the Attorney General's new theories can be raised for the first time on appeal. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33], and cases cited.)

The Attorney General urges us to make an exception to the *Lorenzana* rule in this case on two grounds, but neither is convincing. First he stresses that the evidence at the suppression hearing was not in conflict. But this is true of most suppression hearings: the issue usually turns on the inferences to be drawn from undisputed evidence. Moreover, the evidence might well have been in conflict if the prosecution had raised at the hearing the additional theories that the Attorney General now proposes: we cannot say that in such event defendant would not have elicited other testimony to meet some or all of those theories. Finally, the *Lorenzana* rule is designed to promote resolution at the trial level not only of issues of fact but also issues of law.[12]

Secondly, the Attorney General states in his brief that "We disclaim any interest in the issue of the admissibility of the suppressed tangible evidence"; rather, he assertedly challenges the superior court's ruling on that issue only in order to defend its subsequent decision to admit defendant's confession, "but for a slightly different reason." This disingenuous understatement, however, cannot hide the fact that the Attorney General is nevertheless vigorously attacking the suppression ruling, and that to permit him to do so *for any reason* "on theories thereafter invented for the consumption of reviewing courts" (*People* v. *Superior Court* (*Simon*) (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205]) would frustrate the purposes of both Penal Code section 1538.5 (*Lorenzana,* at p. 640) and the exclusionary rule itself (*Simon,* at p. 198), and deprive the defendant of a fair opportunity to fully litigate his case in the appropriate forum (*id.* at pp. 198-199).

---

[11]We leave for another day the intriguing question whether, when correctly construed, *any* of the general Penal Code sections invoked in this case (i.e., §§ 374b, 374b.5, or 375) is intended to punish the specific act observed by Officer Tucker. (Compare Pen. Code, § 372a [spitting in public places].) The officer further testified that the act is also prohibited by a Vallejo municipal ordinance.

[12]As we explained in *Lorenzana* (*ibid.*), at the suppression hearing "All parties faced the obligation of presenting all their testimony and *arguments* relative to the question of the admissibility of the evidence at that time. If the People had other *theories* to support their contention that the evidence was not the product of illegal police conduct, the proper place to argue those *theories* was on the trial level at the suppression hearing. . . . To allow a reopening of the question on the basis of new legal *theories* to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all *arguments* relative to the question when the issue of admissibility of evidence is initially raised." (Italics added.)

It follows that the order of the trial court suppressing the physical evidence seized by Officer Tucker in the parking lot stands in effect unchallenged, and that evidence will therefore be inadmissible on retrial. ▮ ▮ ▮ ▮ The eyewitness testimony of the robbery victim himself, of course, will be admissible in any such proceeding.[13]

The judgment is reversed.

Bird, C. J., Broussard, J., Reynoso, J., Grodin, J., and Gilbert, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

Despite the passage of Proposition 8 by the electorate in June 1982, and the consequent amendment to the California Constitution (art. I, § 28, subd. (d)) declaring that "relevant evidence shall not be excluded in any criminal proceeding," more than a year later the majority continues to reverse criminal convictions solely in reliance upon the now *abrogated* state exclusionary rule. I strongly disagree with the majority's continued refusal to give immediate effect to the people's clear intent in adopting Proposition 8.

In the present case, apparently no one questions that defendant's confession was admissible under *federal* constitutional principles (see *Michigan* v. *Mosely* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321]). The majority bases its conclusion of inadmissibility entirely upon *People* v. *Pettingill* (1978) 21 Cal.2d 231, 249-251 [145 Cal.Rptr. 861, 578 P.2d 108], which rested on its own interpretation of the California Constitution. The majority of this court refused to follow the federal *Mosely* precedent. The majority continues to thwart the people's unambiguous and demonstrable intent to "overcome" decisions such as *Pettingill* which had "created additional rights for the criminally accused and placed more restrictions on law enforcement officers" than were required under federal law. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 8, 1982), argument in favor of Prop. 8, p. 34; *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 248 [186 Cal.Rptr. 30, 651 P.2d 274].)

Because defendant's alleged offenses occurred prior to the adoption of Proposition 8, the majority holds that none of the provisions of that measure is applicable to him. According to the majority, Proposition 8 applies "only

---

[13]The trial court also correctly ruled inadmissible evidence offered by defendant to show he engaged in consensual homosexual acts with the victim during the days prior to the robbery.

*Assigned by the Chairperson of the Judicial Council.

to criminal proceedings arising out of offenses committed on or after the date it took effect." (*Ante,* p. 262.) In other words, even as to defendants who are tried (or retried) *after* the adoption of Proposition 8, such defendants may continue to enjoy the shield of an abrogated state exclusionary rule if their offenses occurred before its passage. Contrary to the majority's analysis, this holding is neither consistent with the purpose of those who drafted and voted for Proposition 8, nor compelled by constitutional ex post facto principles.

### 1. *Intent: Full Retroactivity to All Cases Not Yet Final.*

The ballot arguments supporting Proposition 8 stressed a "vital" need to reverse the trend of the appellate courts' prior decisions which "For too long . . . have demonstrated more concern with the rights of criminals than with the rights of innocent victims." (Ballot Pamp., *supra,* p. 34.) The supporters of Proposition 8 urged "decisive action against violent crime," and promised that its adoption would result in "more criminal convictions, more criminals being sentenced to state prison, and more protection for the law-abiding citizenry." (*Ibid.*)

There seems no reasonable doubt whatever that those persons who drafted and voted for Proposition 8 intended that its provisions (and especially the abrogation of a state exclusionary rule) would take effect *as soon as constitutionally possible.* The wording of new article I, section 28, subdivision (d), of the state Constitution reinforces that conclusion, for it provides that (with exceptions not pertinent here) "relevant evidence shall not be excluded in *any* criminal proceeding." (Italics added.) This constitutional provision is not limited to, nor does it affect only, those criminal proceedings involving crimes committed on or after June 8, 1982. The restriction conjured by the majority is imaginary, lacking any basis either in the history of Proposition 8 or in general law.

Focusing upon isolated language in the preamble to Proposition 8, the majority suggests that "by declaring the purpose of Proposition 8 to be the deterrence of crime the voters must have intended the measure to apply only to offenses that *could* be deterred, i.e., that had not already been committed by the time Proposition 8 was adopted." (*Ante,* pp. 258-259.) The argument is specious. The *immediate* application to "*any* criminal proceeding" of the provisions of Proposition 8, including its abrogation of the state exclusionary rule, would result in criminal convictions previously unobtainable by reason of the rule, and would obviously serve a maximum deterrent purpose. The state exclusionary rule, being judicially created and not constitutionally founded, most certainly is not beyond the people's reach to remove it. Here, they have embedded this removal in their Constitution.

In the present case the majority holds that defendant's conviction must be reversed because his confession was elicited in violation of *state* constitutional principles. Accordingly, should the People choose to retry defendant without the benefit of his confession of the crime, a conviction may be much more difficult to obtain. If Proposition 8 is applied, however, the conviction undoubtedly would be affirmed. Can there be any reasonable doubt regarding the probable intent of both the authors and voters as to the retroactive application of Proposition 8 in such a situation? Is it likely that either authors or voters would have favored the acquittal of a confessed robber merely because of a technical violation of the prophylactic rules which previously we had judicially created to "protect" such persons from police interrogation and which the people themselves had so recently abrogated?

It also should be observed that, because of the majority's holding, California courts henceforth must apply two different sets of evidentiary rules in criminal cases, depending solely upon the date of commission of the offense or offenses. Hereafter, a single search conducted after the adoption of Proposition 8 which may disclose evidence of multiple crimes could be ruled valid as to certain crimes, and invalid as to others. Such needless anomalies make no sense constitutionally or otherwise and lessen the public's respect for our decisions.

2. *Ex Post Facto Principles Are Inapplicable Here.*

The majority assertedly declines a retroactive application of Proposition 8 in order to "avoid doubts" regarding the constitutionality of the measure as applied to crimes committed prior to its adoption. (*Ante,* p. 262.) With due respect to my colleagues, I suggest that the point is clearly frivolous. California cases, including our own, have uniformly held that ex post facto principles are not violated by the retroactive application of a *statute* which merely alters evidentiary rules by permitting the admission of previously inadmissible or incompetent evidence, and which does not lessen the amount or measure of the proof previously necessary to convict. (*People* v. *Bradford* (1969) 70 Cal.2d 333, 343-344, fn. 5 [74 Cal.Rptr. 726, 450 P.2d 46]; *People* v. *Ward* (1958) 50 Cal.2d 702, 710 [328 P.2d 777]; *People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 473 [106 Cal.Rptr. 519].) *A fortiori,* a *constitutional* change in evidentiary rules does not invoke ex post facto principles. Moreover, it should be borne in mind that, despite the majority's sweeping pronouncements and dicta regarding the retroactive effect of Proposition 8 as a whole, we deal here only with the application of the "truth-in-evidence" portion of the measure, embodied in new article I, section 28, subdivision (d), of our state Constitution. The sole effect of this provision is to permit the admission of relevant evidence in criminal proceedings. Under

the foregoing authorities, such constitutional enactment properly may be given retroactive effect in cases not yet final.

Thus, in *Ward* we considered whether an amendment to the death penalty laws which permitted the introduction at the penalty phase of evidence in aggravation or mitigation of the offense (former Pen. Code, § 190.1) could be applied to a defendant whose offense occurred prior to its adoption. As in the present case, defendant in *Ward* argued that evidence of his jail and juvenile court records would have been inadmissible prior to the amendment and, accordingly, that the change in procedure altered the situation to his substantial detriment and constituted the enactment of an ex post facto law. (50 Cal.2d at p. 708.) In flatly rejecting his argument, we observed that "Changes of a similar nature had heretofore been approved as not constituting ex post facto laws in this state," and discussed several California and federal cases on the subject, including *Thompson* v. *Missouri* (1898) 171 U.S. 380 [43 L.Ed. 204, 18 S.Ct. 922]. (*Id.,* at pp. 708-709.) *Thompson* had held that "we cannot perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case . . . which was not admissible under the rules of evidence . . . at the time the offense was committed." (P. 386 [43 L.Ed.2d at p. 207].)

Similarly, in *People* v. *Bradford, supra,* 70 Cal.2d 333, we again relied upon *Thompson* in concluding that "changes in the rules of evidence which broaden the class of persons competent to testify are not deemed ex post facto in operation." (Pp. 343-344, fn. 5.) In *Bradford,* the defendant's spouse was permitted to testify over his objection by reason of the adoption of Evidence Code section 970, a provision which was not in effect when the offense was committed. We again rejected defendant's claim that the new statute could not be retroactively applied under ex post facto principles.

In light of our own holdings in *Ward* and *Bradford,* and the high court's ruling in *Thompson,* it cannot fairly be said that the issue is so fraught with "uncertainties" (*ante,* p. 262) as to require a prospective application of Proposition 8. In my view, the lesson taught by the foregoing line of cases is crystal clear: Although the new law cannot permit a criminal conviction to be obtained with *less* evidence than was required when the act was committed, the new law properly may *ease prior evidentiary restrictions,* thereby permitting the admission of *more* relevant evidence than previously was allowed.

The people's manifest intent in adopting new article I, section 28, subdivision (d), was to erase California's exclusionary rule *as soon as consti-*

*tutionally permissible.* There is no constitutional impediment whatever to a retroactive application of the new provision with respect to criminal cases not yet final. Although we created the state exclusionary rule it ill behooves us to frustrate or delay its removal by the people themselves.

I would affirm the judgment.