[No. A026664. First Dist., Div. Four. Jan. 27, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MORGAN ANDRE TYSON, Defendant and Appellant.

[Opinion certified for partial publication.†]

† Pursuant to California Rules of Court, rules 976 (b) and 976.1, this opinion is certified for publication with the exception of parts III-VIII.

**COUNSEL**

Jo Anne Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David Salmon and Joyce E. Hee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHANNELL, J.**—A jury convicted appellant Morgan Andre Tyson of second degree murder, attempted robbery, two counts of assault, and two counts of robbery. (Pen. Code, §§ 187, 211, 245, subd. (a)(1), 664.)[1] Tyson appeals, contending that (1) his statements were taken in violation of *Miranda* and were involuntary; (2) the murder charge should have been severed from the remaining counts; (3) an in-court identification of Tyson should have been excluded; (4) the trial court's persistent acts of overruling his objections evidence its bias against Tyson; (5) the jury was incorrectly instructed; and (6) his sentence was improperly enhanced. We affirm the judgment.

## I. FACTS

### A. *Assault and Robbery of Karen Kline*

Close to midnight on June 21, 1982,[2] Karen Kline walked from her car toward Highland Hospital on East 31st Street in Oakland. Hearing footsteps, she turned and saw a man who stabbed her in the head and chest with a scissor-type weapon. After she was stabbed twice, she fell to the ground. Her assailant knelt beside her, placed his hand on her mouth, and said, " 'Don't scream or I'll kill you.' " At this point, Kline saw the man clearly.[3] He pulled her to her feet and tried to "take her down the street." Eventually, he grabbed her purse, threw her to the ground, and fled.

A week later, Kline was shown a series of six photographs. She chose two "possible identifications," explaining that it would be better if she could "see a full bodied person." One of the photographs she chose was of appellant Morgan Andre Tyson. Later, she viewed a composite prepared from a description provided by another crime victim. Kline said that it resembled the man who attacked her. In a subsequent physical lineup, she positively identified Tyson as her assailant.

### B. *Robbery of Tina Marie Boston*

On July 2 about 11:30 p.m., Tina Marie Boston and eight-year-old Titania Williams walked from a bus stop on East 23d Street toward their home on East 28th Street in Oakland. During the walk, they heard footsteps behind them and turned to see a man jogging by. As they walked on, the

---

[1] All statutory references are to the Penal Code, unless otherwise indicated.

[2] All dates refer to the 1982 calendar year, unless otherwise indicated.

[3] She described her assailant as a light-skinned Black man with a scraggly beard, medium height, light build, and wearing dark-colored clothing and a navy cap.

man jumped out of some bushes and pushed Titania down. He hit Boston in the jaw and said, " 'Shut up or I'll kill you.' " He took her purse and fled. Boston did not see a knife, but Titania said he was armed.

Titania described the assailant as a light-skinned Black man with a beard, wearing a jogging suit, tennis shoes, and a blue hat. At trial, she identified Tyson as the attacker. Boston was able to see her assailant clearly. She described him as a light-skinned Black, between 20 and 30 years of age, about 5 feet 6 inches tall, 140 pounds, and having a "fluffy" beard, a "raggedy" moustache, and short "nappie" hair. He wore a blue and black knit hat, a jacket, and sweat pants. Boston was unable to make an identification at a pretrial lineup and testified at trial that Tyson did not look like her attacker. However, she did assist the police in making a composite drawing of the man.

## C. *Assault and Attempted Robbery of Janet Charles*

About midnight on July 4, Janet Charles got off a bus on East 27th Street in Oakland and walked towards her home on 21st Street. As she approached East 21st Street, she noticed a man carrying a "sharp object" on the opposite side of the street. Charles turned and walked in the opposite direction. The man crossed the street, approached from the rear, and asked for a cigarette. Charles picked up her pace; so did the man. She then saw an object raised in the air; the man hit her on the head. As she turned, he stabbed her in the breast and on the head once again, using either a knife or "a file with a pointer on the end." He forced her to the ground and tried to take her purse, but she kicked him "in the privates." The man fled.

Charles saw the man clearly under the streetlights. In late July, she identified Tyson in a series of photographs shown to her by the police. She also identified him at trial. She described her attacker as either Mexican or light Black, with "a little moustache and a little beard," and wearing a derby jacket, khaki or green pants, and a navy blue or black watch cap.

## D. *Second Degree Murder of Gail Williams*

On July 9, Sharon King went to the apartment of her fellow employee, Gail Williams, on East 30th Street in Oakland near Highland Hospital. Later, she decided to spend the evening, going to sleep about 2:30. Williams's boyfriend, Steve Allen, left about 2:30 a.m.; he saw Williams, dressed in her nightclothes, lock the door after him. About an hour later, King awoke and heard Williams coming in the front door. Williams, fully dressed, called for King and said that she had been stabbed. Before the ambulance arrived, Williams told Oakland Police Officer Horatious B. Pet-

ty that she had been attacked at the bottom of the stairway entry into her apartment complex. She described her attacker as a Black man with a light complexion and a beard, between five feet six and five feet eight inches tall, wearing a light blue shirt and blue jeans. Later that morning, Williams died from multiple stab wounds.

### E. *Investigation and Trial*

Oakland Police Sergeant Daniel Murray investigated Williams's death. On July 13, he received a telephone call from an unidentified woman who implicated Tyson.[4] In the next two weeks, the woman called six or seven more times. The woman told Murray that Tyson was living with his mother on East 28th Street in Oakland.

On July 13, Murray met Tina Marie Boston. They created a composite picture of her attacker. He showed a photograph lineup to Kline, Charles, and a woman who had been the victim of a sexual assault in the same area. Based on Charles's identification of Tyson, Murray obtained an arrest warrant for him and a search warrant for his mother's house. The search revealed a knife with a broken tip and a pair of scissors, but Tyson was not present. Tyson's mother informed Murray that her son was in National City with his brother and sister-in-law. An arrest warrant was sent there.

Tyson was arrested in National City. He was transported back to Oakland and interviewed on July 29. Initially, Tyson denied all involvement in the crimes. After an hour and a half, Sergeant David Politzer brought in a fingerprint analysis form which he told Tyson connected him to the crimes. About a half-hour later, Tyson began to confess, admitting each of the offenses, except the sexual assault charge. He also admitted attacking another woman, a crime of which the police were unaware. He claimed to have used the same weapon each time: a piece of metal, not a knife or scissors.

Tyson was charged with one count of murder with a weapon use allegation (§§ 187, 12022, subd. (b)); two counts of assault with a deadly weapon (§ 245, subd. (a)(1)); one count of attempted robbery with a weapon use allegation (§§ 211, 664, 12022, subd. (b)); and two counts of robbery with weapon use allegations (§§ 211, 12022, subd. (b)).[5] His motion to sever the murder count from the remaining counts was denied. After his first trial ended in a hung jury, Tyson's case was set to be retried. His pretrial mo-

---

[4] The woman, he learned later, was Vivian King, the aunt of Tyson's sister-in-law Gloria. King testified that she had learned of Tyson's involvement through Gloria, who lived with Tyson's mother. Gloria denied telling King anything about Tyson.

[5] The information also alleged that Tyson had been convicted of a prior offense; the trial court struck the allegation.

tions to suppress Kline's in-court identification and his statement to police were denied.

At his second trial, Tyson's taped confession was played for the jury. Tyson testified in his own behalf, denying that he committed any of the charged offenses. He explained that he gave a false confession because Politzer had hit him twice on the side of the head. The jury found Tyson guilty of the second degree murder of Gail Williams with a weapon use enhancement, the robbery of Tina Marie Boston, the robbery of Karen Kline with a weapon use enhancement, the attempted robbery of Janet Charles with a weapon use enhancement, and two counts of assault with a deadly weapon—one assault on Janet Charles and one on Karen Kline. (See §§ 187, 211, 245, subd. (a)(1), 664, 12022, subd. (b).) Tyson was sentenced to sixteen years to life on the murder charge and given a determinate sentence of four years and four months on the remaining charges. A timely notice of appeal from the judgment was filed.

## II. *MIRANDA* ERROR

 Tyson first contends that the trial court should have granted his motion to suppress the statements he made to police because they were obtained in violation of *Miranda*. He argues that he invoked his right to have an attorney present when he stated that his mother thought he should have an attorney present.

After giving Tyson his *Miranda* warnings, Sergeant Murray asked the defendant if he understood each of them. Tyson said that he did. Murray then asked if Tyson, having these rights in mind, wished to speak with the officers. Tyson responded that he had spoken with his mother on the telephone and she said that he might need an attorney. The officer responded that Tyson was an adult, that the arrest warrant was for him, and that it would have to be his decision whether he spoke with police.[6] After a short pause, Tyson said, " 'All right. I think I can clear this up. I'll talk to you.' " The officer reread the admonishments and Tyson said he wanted to talk with them. He signed a written consent form to that effect.[7] The trial court found beyond a reasonable doubt that the police conduct did not violate *Miranda*. At the time of the questioning, Tyson was 29 or 30 years old.[8] On

---

[6] Contrary to our dissenting colleague, we fail to see how this language could reasonably be construed as argumentative, demeaning or badgering Tyson into relinquishing his *Miranda* rights.

[7] At the hearing on the motion to suppress the confessions, Tyson agreed with Murray's version of this incident. However, he added that he requested an attorney five or six more times during the interview. The trial court stated that it did not believe this testimony, and Tyson does not reassert it on appeal.

[8] We agree with the Attorney General that Tyson's statement is not to be judged by the standards for a juvenile's invocation of the right to remain silent, because he was an adult at the time of questioning.

appeal, Tyson contends that he invoked his right to have an attorney present when he stated that his mother suggested that he have an attorney.

■ Faced with uncontroverted evidence on appeal, we must independently assess whether Tyson invoked his *Miranda* rights. (See, e.g., *Smith* v. *Illinois* (1984) 469 U.S. 91 [83 L.Ed.2d 488, 105 S.Ct. 490]; see also *People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1175-1176 [196 Cal.Rptr. 466] [waiver case]; *People* v. *Diaz* (1983) 140 Cal.App.3d 813, 820 [189 Cal.Rptr. 784] [waiver case].) The crimes alleged were committed in late June and early July 1982, *after* Proposition 8 took effect in early June 1982. ■ As such, federal constitutional standards, rather than independent state grounds, apply when determining whether the police conduct was proper. (*In re Lance W.* (1985) 37 Cal.3d 873, 890 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Smith* (1983) 34 Cal.3d 251, 258-263 [193 Cal.Rptr. 692, 667 P.2d 149]; see Cal. Const., art. I, § 28, subd. (d).)

■ When an accused expresses a desire to deal with the police only through counsel, all further interrogation by the authorities must cease until counsel is present. (*Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386-387, 101 S.Ct. 1880]; see *Arizona* v. *Mauro* (1987) 481 U.S. 520, 525-526 [95 L.Ed.2d 458, 465-466, 107 S.Ct. 1931, 1934].) ■ The focus of our inquiry is whether Tyson actually invoked his right to counsel—whether he "expressed *his* desire" for, or "*clearly* asserted" his right to, the assistance of counsel. (See *Smith* v. *Illinois, supra,* 469 U.S. at p. 95 [83 L.Ed.2d at p. 493], italics added.) Measured against this standard, Tyson's statement—that his *mother suggested* that he have an attorney—is neither an expression of *his* desire for counsel nor a *clear* assertion of the right to counsel. In *Smith,* a defendant was held to have invoked his right to counsel by stating "I'd like to do that" after being advised of this right. (*Id.,* at pp. 93, 97 [83 L.Ed.2d at pp. 492, 494-495].) Apparently, the United States Supreme Court found that an earlier statement—that someone told him to get a lawyer because the police would try to railroad him otherwise—was *not* an invocation of the right to counsel. (See *id.,* at pp. 92-93, 96, fn. 4 [83 L.Ed.2d at pp. 491-492, 494].) The statement that Tyson claims invoked his right to counsel is sufficiently similar to the statement that the high court in *Smith* appears to have found inadequate that we are satisfied that Tyson did not invoke this right by his statement. Therefore, the trial court properly denied his motion to suppress the confession.[9]

---

[9] We do not find Tyson's statement to be an "ambiguous" request for counsel. Therefore, we need not address the effect of such an ambiguous request, nor the propriety of clarifying questions. (See *Smith* v. *Illinois, supra,* 469 U.S. at p. 96, fn. 3 [83 L.Ed.2d at p. 494] [declining to determine effect of ambiguous request, but pointing out conflict over proper resolution]; *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 735-737 [125 Cal.Rptr. 798,

III-VIII*

. . . . . . . . . . . . . . . . . . . .

The judgment is modified by striking the four-month enhancement from count IV, the Kline robbery. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment to reflect this modification and to forward a certified copy of it to the Department of Corrections.

Anderson, P. J., concurred.

**POCHÉ, J.**—I respectfully dissent from the majority's conclusion that defendant unambiguously waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].[1]

That defendant's statement was *unambiguous* and that it was a waiver will come as a surprise to the interrogating police officers who took defendant's response to be an ambiguous invocation of his right to counsel. The officers immediately rejoined by telling him he was an adult, and that he would have to make up his own mind as to whether he wanted to speak with the police.[2] Put plainly, if the officers right there on the scene hearing the words as they were uttered did not understand them to mean that defendant was affirmatively agreeing to speak with them, how can an appellate court reading a cold record have such intuitive powers? In all other cases I can remember this court as a matter of routine defers to what it calls police officer expertise. Why abandon that practice here?

My complaint is with the method by which these police officers elicited defendant's actual waiver which came later: they argued with him once he mentioned that he had been advised that he needed an attorney. At that point the officers did not follow up with legitimate clarifying questions, such as, *Does that mean you are invoking your right to counsel*? or even *Are you invoking your right to counsel*? Instead, the officers became argumentative and demeaning and in effect told defendant to grow up and make his own decisions. I know of no *Miranda* case, either in the federal or California system, which allows the police to badger a witness into relinquishing his

---

542 P.2d 1390] [pre-Proposition 8 decision prohibiting officers from asking clarifying questions after ambiguous response to request for invocation of right to counsel].)

* See footnote, *ante,* page 1275.

[1] I express no opinion on the remaining issues on appeal.

[2] Unfortunately, this portion of the interview was not tape-recorded by the police; the sole record of the crucial questioning is the memory of the interrogating police officers.

*Miranda* rights. In my view, therefore, the trial court erred in denying defendant's motion to suppress the resulting confession.

Because the error is of federal constitutional dimension, the judgment must be reversed unless the prosecution can demonstrate that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The error here cannot be so characterized. I would therefore reverse.

Appellant's petition for review by the Supreme Court was denied April 27, 1988.