[Crim. No. 44557. Second Dist., Div. One. Mar. 28, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY FISHER, Defendant and Appellant.

COUNSEL

Scott T. Carss, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and Craig E. Veals, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HANSON (Thaxton), J.—**

### INTRODUCTION

Defendant Terry Fisher (defendant and/or Fisher) appeals from his conviction, following a jury trial, of robbery (Pen. Code, § 211; count I) and assault with a deadly weapon (Pen. Code, § 245, subd. (a); count II). The findings that he used a firearm and intentionally inflicted great bodily injury during the commission of the offenses were found to be true (Pen. Code, §§ 12022.5, 12022.7). He admitted having been previously convicted of a felony (Pen. Code, § 667.5, subd. (a)). We affirm the judgment.

### THE FACTS

The People's case consisted of the following evidence. Henry Parker, the victim, testified that on the evening of February 13, 1982, at about 10 p.m., he was coming out of Snappy's Liquor Store at the corner of 41st and Main Streets in Los Angeles when defendant Fisher approached him. Parker recognized Fisher, having seen him in the area on previous occasions. Defendant Fisher demanded of Parker, " 'Give it here,' " and brandished an up and over shotgun. Parker asked defendant, " 'What are you talking about, man?' " and the defendant replied, " 'Goddamnit. I said give it here.' " Parker attempted to grab defendant's shotgun, and defendant shot him in the collarbone area of his neck. Although seriously wounded (described by prosecution witness Dr. Bernard Glasser as nearly fatal), Parker managed to get on his feet, removed $10 or $12 from his pocket, which he threw on

the ground. Defendant Fisher scooped up the money and then fled in a car driven by another.[1]

---

[1]The reporter's transcript contains the following testimony of the victim Henry Parker during direct examination:

"Q. As you were walking to your car, sir, did anybody stop you?

"A. Yes, sir.

"Q. Is that person present in court today?

"A. Yes, sir.

"Q. Where is he seated?

"A. Fellow with the white hair.

"THE COURT: Indicating the defendant.

"Q. BY MR. PATCHETT: Do you remember what the defendant was wearing on that day?

"A. He had a long coat on.

"Q. Do you remember the color of the coat?

"A. It was a tan like.

"Q. And did he do anything?

"A. Yes, sir.

"Q. What did he do?

"A. I was walking real fast to my car. He ran around in front of me and threw the coat back and said, 'Give it here.'

"Q. When he said, 'Give it here,' did he have anything in his hand?

"A. He had an up and over shotgun. It's half rifle and half shotgun, call it an up and over.

"Q. When you first saw Mr. Fisher was he speaking to anybody?

"A. Yes, sir.

"Q. And who was that?

"A. He was talking to a lady by the name of Rochelle, Andree Rochelle de Veres, I think the last name is.

"Q. Did you see him before you went into the liquor store?

"A. Yes, sir.

"Q. And was he talking to this woman before he went into the liquor store—before you went into the liquor store?

"A. Yes, sir.

"Q. And was he talking to that same woman when you came out of the liquor store?

"A. Yes, sir.

"Q. Now, when he made this statement, 'Give it here,' what did you do, sir?

"A. I asked him—I said, 'What are you talking about, Man?' And he made a statement, he says, 'Goddamnit. I said give it here.' [¶] And I said, 'What are you talking about?' I repeated two or three times, I said, 'What are you talking about?' He said, 'Goddamnit. I said give it here.' So I advanced toward him like, you know, I was gonna grab—in fact, I intended to grab the barrel of the shotgun, so—

"Q. How far away were you when he made that first statement to you, sir?

"A. I was about—approximately about six, six feet, about five or six feet away from him.

"Q. And how close did you get to the defendant?

"A. Almost in hand's reach of him, about that close when I grabbed at the shotgun (indicating).

"THE COURT: Indicating about eight inches.

"Q. BY MR. PATCHETT: And when your hand was approximately eight inches from the barrel of this weapon what happened, sir?

"A. He shot me right through here (indicating).

"Q. That's indicating the area right by your tie?

"A. In my collarbone, right by my neck here.

"Q. Now, when you were shot near your collarbone was the woman, Andree, still out there?

"A. Couldn't—I really don't—I don't know. She—when—when I—when he shot me the blow knocked me down, and I jumped back up to my feet, and when I—

Prosecution witness, Andree DeVeres testified that she knew defendant Fisher and was conversing with him for about 30 minutes before the robbery

"Q. You said that you were knocked down, then you got back to your feet?

"A. When I got back to my feet I reached in this pocket here, my left pocket, and I threw out—I had some ones, I had about 20 ones and I threw ten or twelve of them, I don't know exactly the amount. I know it was ten or twelve because I still had some in my left pocket. I threw it on the ground. I said, 'Get it, you son of a bitch' and he—

"Q. What did you see the defendant do?

"A. He reached down and was picking it up with one hand and looking at me with the gun in one hand.

"Q. Okay. [¶] After he picked up the money did you see what he did at that time? ·

"A. Yes. His partner, Chuckie, pulled around off the lot and picked him up and they fled off in the car.

"Q. You remember what type of a car that was?

"A. It was about a '71, I'd say roughly a '71 or '2 Buick, dark.

" .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. Had you ever seen the defendant prior to February the 13th of 1982?

"A. Yes, sir.

"Q. On how many occasions had you seen the defendant prior to that date?

"A. Five or six times.

" .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. BY MR. PATCHETT: The first time you saw him—First, how many weeks before this incident that you saw him?

"A. Before when he shot at—

"Q. When he shot at you.

"A. Oh.

"Q. When he shot you.

"A. About—it was about two—about two, two or three weeks, two—just about two or three weeks roughly.

"Q. And the location where you saw him?

"A. Standing right by the telephone booth.

"Q. Maybe I'm confused. [¶] The first time that you saw the defendant you said was about three weeks before that standing by a telephone booth. [¶] What telephone booth are you speaking about, sir?

"A. The telephone booth right by Snappy's Liquor Store.

"Q. So the first time you saw him was the place that you saw him on this particular date also; is that correct?

". "A. Well, you said not—you said not to say the first time I saw him. [¶] The first time I saw him is when he shot at Tony. That's the first time I saw him.

"Q. Just hold on for a second, Mr. Parker. [¶] The first time that you saw him you said he was shooting at somebody else?

"A. Right.

"Q. Where was that location?

"A. That was on 40th Place and Main.

"Q. And how long before February the 13th was that particular date?

"A. That was about oh, say six weeks to two months.

"Q. And did you know the person that you saw the defendant with at 40th Place and Main?

"A. No, I didn't.

"Q. Did you know of him?

"A. I seen him.

"Q. Well, you said the person Tony, who is Tony?

"A. Tony is—he's Rochelle's husband.

"Q. Are you talking about Andree de Veres' husband?

"A. Right.

"Q. What type of a weapon did you see the defendant use when he shot at Tony?

and also saw the victim Parker (whom she also knew) standing on the curb near the liquor store; that she went into a telephone booth and as she hung up the telephone, she saw Fisher holding a long, narrow steel object in his hand approach Parker. Witness DeVeres became scared, and ran into Snappy's Liquor Store and immediately heard two shots. She ventured outside and saw that Parker had been shot in the shoulder area and that defendant Fisher was not around.[2]

Prosecution witness Terrence Melton, an employee at Snappy's Liquor Store, testified that on February 13, 1982, at about 10 p.m. he heard a gunshot outside and people came running into the store in a state of panic; that he went outside and saw the victim Parker on the sidewalk getting up, and another man with white hair and in a beige overcoat raise up after picking up something and then run toward a car; and that he [Melton] took the victim to the hospital.

### THE ALIBI DEFENSE

The defense called Alvines Richards who testified that he was defendant Fisher's friend and that at the time of the robbery on February 13, 1982; that Fisher was ill and stayed at his [Richards'] home throughout that day and evening.

A second defense witness, Olivia Verrett, testified that she saw defendant Fisher at Richards' residence on the evening of the robbery and that he was ill.

---

"  . . . . . . . . . . . . . . . . . . . . . .

"THE WITNESS: The same, it was the same rifle.

"Q. BY MR. PATCHETT: When you say the same rifle, what do you mean?

"A. The up and over shotgun.

"Q. So you're saying the same weapon that he shot you with you saw him shoot at somebody else four weeks or more before that incident?

"A. Right.

"Q. Now, after that time did you see him after the time of the incident with Andree's husband?

"A. I don't think so, no.

"Q. Well, from the time of that first incident until the time that you were shot yourself did you see the defendant? That's what I'm asking you.

"A. Oh, I seen him, yes, I did.

"Q. And where did you see him?

"A. His usual spot. He always stood right by the telephone booth.

"Q. Is that the same phone booth that you saw him on February the 13th, 1982, before entering Snappy's Liquor Store?

"A. Yes, sir.

"  . . . . . . . . . . . . . . . . . . . . . ."

[2]Prosecution witness, David Correa, an investigator with the district attorney's office, testified that when he interviewed witness DeVeres on June 17, 1982, he took notes which reflected that witness DeVeres described the weapon defendant had as a sawed-off shotgun and heard Fisher say to Parker, at the time of the robbery, "Give it up."

Defendant Fisher elected not to testify on his own behalf.

ISSUE

*Background*: At the commencement of trial, defense counsel moved under Evidence Code section 402 to preclude the jury from learning of defendant's four prior felony convictions should he elect to testify. The trial court ruled that two of the priors, a 1951 robbery and a 1958 receiving stolen property, could not be used for impeachment because they were too remote but that the defendant's 1965 and 1977 robbery convictions were admissible. The court primarily relied upon the impeachment-without-limitation section of Proposition 8 (Cal. Const., art. I, § 28, subd. (f)), and explained its ruling as follows: "Proposition 8 binds the court, and it means what it says, and that is that prior convictions can be used without limitation, irrespective of their nature, to impeach the defendant if he takes the stand, even if that will cause him not to testify. [¶] So in that sense I still have a question in my mind about whether the court can still use section 352 to prevent use of a remote prior, but probably most pertinent for the case and certainly for the defense in the case that would mean—well, that might mean that the 1951 robbery is too remote, and 1958 receiving stolen property. Certainly the 1977 and 1965 robberies are not too remote. [¶] So the People can use those. [¶] Okay. [¶] I'm persuaded too before Proposition 8 that there is not available a due process challenge to the use of say identical prior convictions to impeach a defendant either on federal or state grounds."

Following the court's ruling, defendant Fisher's counsel told the court that defendant Fisher would not testify at trial.

*Issue*: On appeal, defendant Fisher contends that the trial court erred in ruling that his two prior convictions for robbery could be used for impeachment in the event that he testified at trial.

DISCUSSION

Subdivision (f) of section 28 provides, in pertinent part, that: "Any prior conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."

However, in *People* v. *Smith* (1983) 34 Cal.3d 251, at page 258 [193 Cal.Rptr. 692, 667 P.2d 149], our state Supreme Court recently held "that Proposition 8 applies only to prosecutions for crimes committed on or after its effective date." Since defendant Fisher's offense occurred on February 13, 1982, prior to the effective date of Proposition 8, June 9, 1982

(*People* v. *Smith, supra,* at p. 257), the trial court's decision to apply the constitutional provision of Proposition 8 to the instant case was therefore improper. ■ Furthermore, we conclude that the trial court's ruling was erroneous under the balancing test of *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], the law applicable at the time of defendant's crime. The prior robberies were identical to one of the offenses for which Fisher was on trial. Accordingly, the trial court should have ruled the prior robbery convictions inadmissible on this basis. (See *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243]; *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74]; *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19].)

The *Spearman* court, after reviewing the particular facts of that case and speculating what a defense might be, stated at page 119 of 25 Cal.3d: "*This court, therefore, has no basis for concluding that appellant's testimony would not have affected the result of the trial.* ■ '[E]rrors at a trial that deprive a litigant of the opportunity to present his version of the case . . . are . . . *ordinarily* reversible, since there is no way of evaluating whether or not they affected the judgment.' (Traynor, [The Riddle of Harmless Error (1970)] *op. cit. supra,* at p. 68.) A conviction under such circumstances is a 'miscarriage of justice' within the meaning of article VI, section 13 of the California Constitution. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 837; *People* v. *Gainer* (1977) 19 Cal.3d 835, 855 [139 Cal.Rptr. 861, 566 P.2d 997]; *People* v. *Fries, supra,* 24 Cal.3d at pp. 233-234.)" (Italics added.)

■ After a review of the entire record of the case at bench, we conclude 1) that there is a "basis for concluding that [Fisher's] testimony would not have affected the result of the trial," and 2) that reversal is not required since the error complained of was nonprejudicial in that it is not reasonably probable a result more favorable to defendant would have been reached in the absence of the trial court's error (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]).

Here, if defendant Fisher testified and presented a favorable version of the incident in contradiction of his *alibi* defense, he would be impeaching his own defense witnesses (Richards and Verrett). Had Fisher merely reaffirmed their version of his whereabouts, there still would remain overwhelming direct and indirect evidence of his guilt, including the fact that he was positively identified at trial as the robber by the victim Parker (see fn. 1), which identification was strongly supported by the testimony of two independent witnesses, one immediately before the robbery (witness DeVeres) and one immediately after the robbery (witness Melton), both of whom knew Fisher, and whose testimony was believed by the jury.

With due respect, the dissenting opinion has either failed to objectively evaluate the entire record of the instant case as we are compelled to do pursuant to article VI, section 13 of the California Constitution[3] or has misconstrued the state Supreme Court cases of *People* v. *Barrick, supra,* 33 Cal.3d 115; *People* v. *Spearman, supra,* 25 Cal.3d 107; *People* v. *Fries, supra,* 24 Cal.3d 222; and *People* v. *Rist* (1976) 16 Cal.3d 211 [127 Cal.Rptr. 457, 545 P.2d 833], in respect to their application to the case at bench.

The *Rist* court concluded there was *Beagle* error, as this majority opinion also concludes under the facts of the instant case. Instructive here, relative to *Rist* and defendant Fisher's *alibi* defense, is language in *People* v. *Lassell* (1980) 108 Cal.App.3d 720 [166 Cal.Rptr. 678].

In *Lassell* the defendant was charged and convicted of grand theft. The trial court denied defendant's motion to preclude the use of prior convictions for burglary and receiving stolen property for impeachment purposes. The defendant did not testify and was found guilty by a jury. In affirming the conviction, the *Lassell* court observed at pages 730 and 731: "The trial court had no way of knowing what appellant's testimony would have been when it ruled on the *Beagle* motion. Again, on review, this court cannot know what appellant's testimony would have been. The *Rist* court observed: 'Perhaps the most difficult to evaluate of the *Beagle* factors is the adverse effect on the administration of justice should a defendant elect not to testify for fear of impeachment.' (*People* v. *Rist, supra,* 16 Cal.3d 211, 222.) The court pointed the way out of this difficulty: '[*The*] *evaluation must necessarily depend in large part on the totality of other evidence bearing on the question of the defendant's guilt in the unique circumstances of the particular case.' (Ibid.) At trial, witnesses testified to appellant's mistaken identity and alibi defenses.* This is in contrast to the facts of *People* v. *Fries, supra,* 24 Cal.3d 222, 231, in which no witnesses testified to a defense version of the facts. *Here, if appellant had testified it may be inferred that he would probably have corroborated other testimony already given in his defense. His testimony was not essential to the presentation of his defense.* It does not appear from the record that the trial court acted capriciously or arbitrarily in weighing the *Beagle* factors and deciding to permit impeachment." (Italics added.)

■ Unquestionably, neither *Barrick, Spearman, Fries* nor *Rist* mandates a reversal "per se" in every case where a defendant refuses to testify after

the trial court has ruled that if he testified, the prosecutor could inquire into prior similar or identical felony convictions for purposes of impeachment.

In *Barrick, Spearman* and *Fries,* the Supreme Court reversed the judgments of conviction only after a careful analysis of the total evidence in those particular cases and held the error was not harmless after applying the test enunciated in *People* v. *Watson, supra,* 46 Cal.2d 818.[4]

Since the Supreme Court itself, in *Barrick, Spearman,* and *Fries,* applied the harmless error test as enunciated in *People* v. *Watson, supra,* 46 Cal.2d 818, to the evidence in those cases, it is axiomatic that it is the function of

---

[4]In *Fries,* the majority opinion concluded at pages 233-234 of 24 Cal.3d with the following statement: "It is clear that the trial court erred in admitting the prior robbery conviction since the conviction was identical to the offense for which appellant was on trial. *Further, this court has no clue as to what appellant's testimony would have been had he testified. Absent any basis for concluding that such testimony would not have affected the result,* 'the court is of the opinion "that it is reasonably probable that a result more favorable to [appellant] would have been reached in the absence of this error."'" (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)" (Italics added.)

In *Spearman,* the court stated at page 118 of 25 Cal.3d: *"Finally, this court must decide whether the trial court's improper ruling constituted reversible error. (People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) *After consideration of the evidence and the state of the record in this case, it cannot be concluded the error was harmless.* [¶] At the outset, it is recognized that the evidence presented at trial appeared, on paper, to have made out a strong, albeit circumstantial case against appellant. However, that evidence was not, even on a cold transcript, irrebuttable. [¶] More significantly, because of the trial court's erroneous ruling, appellant did not testify and thus was prevented from presenting any defense to the charges. (See also *People* v. *Fries, supra,* 24 Cal.3d at pp. 228-229.) Unquestionably, appellant might have presented exculpatory testimony. He might, for example, have testified he was not aware of the presence of the heroin in the bumper or did not exercise dominion and control over it. He might well have explained that Bluett's car was routinely and recently used by other acquaintances of Bluett, including addicts such as Howard who may themselves have stored heroin in the bumper without the knowledge of the appellant. Alternatively, appellant might have admitted possession of the heroin for personal use but denied any intent to sell. Such testimony, if true, would warrant a conviction for a lesser offense than possession for sale." (Italics added.)

In the most recent Supreme Court *Barrick* case, 33 Cal.3d 115, the court said at page 130: *"Having concluded that the trial court erred in denying defendant's motion to exclude evidence of his prior conviction as 'sanitized,' we must determine whether this error affected the judgment so as to require reversal. The evidence supporting the conviction was largely circumstantial.* Defendant was found asleep in a recently stolen automobile. The record reveals that following the ruling on the *Beagle* motion, the attorney for the defendant advised him not to testify. *This court has no way of knowing what defendant's testimony would have been, thus, we have no basis for concluding that such testimony would not have affected the result.* ' "[E]rrors at a trial that deprive a litigant of the opportunity to present his version of the case . . . are . . . ordinarily reversible, since there is no way of evaluating whether or not they affected the judgment." (Traynor, [The Riddle of Harmless Error (1970)] at p. 68.) A conviction under such circumstances is a "miscarriage of justice" within the meaning of article VI, section 13 of the California Constitution. (See *People* v. *Watson* [(1956)] 46 Cal.2d [818, 836,] 837 [299 P.2d 243]; *People* v. *Gainer* (1977) 19 Cal.3d 835, 855 [139 Cal.Rptr. 861, 566 P.2d 997]; *People* v. *Fries, supra,* 24 Cal.3d at pp. 233-234.)' (*People* v. *Spearman, supra,* 25 Cal.3d at p. 119.)" (Italics added.)

this court to review the entire record and determine whether or not the error in this particular case was, or was not, harmless by applying the same [*Watson*] test.

Hopefully, the dissenting opinion's expressed "heartfelt distress" does not extend to or become unduly exacerbated by "[our] esteemed [Court of Appeal] colleagues'" opinions in *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669] and *People* v. *Betts* (1980) 110 Cal.App.3d 225 [167 Cal.Rptr. 768], which affirmed judgments of conviction where *Beagle* error was raised on appeal. The *Anjell* case involved, as here, an alibi defense. The *Betts* court, as in *Barrick, Spearman,* and *Fries,* applied the *Watson* harmless error test, but concluded that under the facts of that particular case it was not reasonably probable a result more favorable to the defendant would have been reached in the absence of the trial court's error. It is noted that the state Supreme Court denied a petition for a hearing in the *Betts* case on November 12, 1980.

Instructive here is the language in *People* v. *Anjell, supra,* 100 Cal.App.3d 189, which involved the trial court's denial of the defendant's motion for an order preventing the prosecution from impeaching him with his two admitted prior felony convictions if he testified in his own defense, and defendant elected not to testify. In *Anjell,* as in the instant case, the defense called two *alibi* witnesses who testified to his presence at another location [in a restaurant] throughout the evening of the robberies of which he was charged and convicted.

The *Anjell* court in affirming the judgment of conviction, in pertinent part, stated at 100 Cal.App.3d, pages 198-199: "Appellant's *Beagle* motion was not made until after his first alibi witness had testified, and immediately before the second one took the stand. The record supports the inference that the trial court was aware of the second alibi witness, and her prospective testimony, when it ruled on the motion. Both witnesses testified to the alibi defense in detail, and each corroborated the other. We may reasonably assume (i.e., hypothesize) that appellant would have testified to his own 'version' of his alibi. His testimony was not essential to the alibi defense, of which it would have been corroborative and cumulative. The order denying his *Beagle* motion thus did not operate to impair his presentation of the defense in any respect. [¶] . . . [¶] Our recital of the hypothetical circumstances must end short of impermissible speculation by this court as to what and whom the jury might have believed. (See *People* v. *Spearman* (1979) 25 Cal.3d 107, 118-119 [157 Cal.Rptr. 883, 599 P.2d 74].) The totality of circumstances (both real and hypothetical) distinguish this case from each of several '*Beagle* decisions' in which the factor of the defendant's failure to testify required reversal because of its obviously prejudicial effect. In

*People* v. *Kyllingstad* (1978) 85 Cal.App.3d 562 [149 Cal.Rptr. 637], there were time gaps in an alibi defense which could only have been explained by the defendant's testimony. (*Id.*, at p. 570.) In other cases, the respective courts were totally uninformed of defenses or defensive possibilities which might plausibly have been forthcoming if the accused had taken the stand. (E.g., *People* v. *Spearman, supra,* 25 Cal.3d 107 at p. 118; *People* v. *Fries, supra,* 24 Cal.3d 222 at p. 233; *People* v. *Nelson* (1976) 63 Cal.App.3d 11, 23 [133 Cal.Rptr. 552].) In contrast, appellant's alibi defense was fully presented to the jury and his own testimony was not essential to it. Any detrimental effect of his failure to testify was therefore insignificant. . . ."

In *People* v. *Betts, supra,* 110 Cal.App.3d 225 (petn. for hg. den., Nov. 12, 1980), the defendant was charged with attempted grand theft and convicted by a jury of attempted petty theft. The sole contention on appeal was that the trial court committed reversible error when it allowed the prosecutor to ask the defendant if he had been convicted of a felony involving the trait of honesty.

The *Betts* court in affirming the judgment of conviction following a review of the evidence (circumstantial in character), concluded that the trial court erred but held, "Nevertheless, as in *Rollo* [*People* v. *Rollo* (1977) 20 Cal.3d 109 (141 Cal.Rptr. 177, 569 P.2d 771)], we conclude it is not reasonably probable a result more favorable to appellant would have been reached in the absence of the trial court's error (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]) and that the error was therefore not prejudicial." (P. 231.)

Paraphrasing *Betts* at page 234: "With or without [defendant Fisher's] impeachment, [any version presented by him] would have strained the credulity of a rational trier of fact in such fashion as to render the improper references to [Fisher's] previous convictions of little consequence."

Under the particular facts of the case at bench there is clearly a basis, as previously described, for concluding that defendant Fisher's testimony could not have affected the result of the trial and the error was not prejudicial. The defendant has been fairly tried and justly convicted. There has been no miscarriage of justice.

DISPOSITION

The judgment of conviction is affirmed.

Lillie, Acting P. J., concurred.

**DALSIMER, J.**—I respectfully dissent. The erroneous denial of appellant's motion to exclude evidence of his robbery convictions constituted prejudicial error requiring reversal of the judgment. The record expressly reveals that appellant's decision not to testify was caused by the court's denial of the motion and the likelihood of appellant's impeachment with identical priors should he take the stand. (Cf. *People* v. *Broder* (1983) 147 Cal.App.3d 572, 575-576 [195 Cal.Rptr. 264]; *People* v. *Burdine* (1979) 99 Cal.App.3d 442, 450 [160 Cal.Rptr. 375].)

Our Supreme Court has repeatedly held that evaluation of the impact on the jury of testimony a defendant would have given but did not give is ordinarily beyond the ability of an appellate court. (*People* v. *Barrick* (1982) 33 Cal.3d 115, 130 [187 Cal.Rptr. 716, 654 P.2d 1243]; *People* v. *Spearman* (1979) 25 Cal.3d 107, 118-119 [157 Cal.Rptr. 883, 599 P.2d 74]; *People* v. *Fries* (1979) 24 Cal.3d 222, 233-234 [155 Cal.Rptr. 194, 594 Cal.Rptr. 19]; *People* v. *Rist* (1976) 16 Cal.3d 211, 223 [127 Cal.Rptr. 457, 545 P.2d 833].)

At the heart of this case is a credibility conflict between the two prosecution witnesses, Henry Parker and Andree DeVeres, who placed appellant at Snappy's Liquor Store, and the two defense witnesses, Alvines Richards and Olivia Verrett, who testified that appellant was sick at Richards' house on the evening in question. A case with a credibility conflict is exactly the type of case where a defendant's testimony is most crucial and where an appellate court is least able to evaluate the impact of a defendant's failure to testify.

This court is bound by the holding of the Supreme Court in *People* v. *Spearman, supra,* 25 Cal.3d at pages 118-119 (fn. omitted): "Whether the jury would have believed [appellant's] testimony calls for speculation beyond the powers of this appellate court. 'The appellate court is limited to the mute record below. Many factors may affect the probative value of testimony, such as age, sex, intelligence, experience, occupation, demeanor, or temperament of the witness. A trial court or jury before whom witnesses appear is at least in a position to take note of such factors. An appellate court has no way of doing so. It cannot know whether a witness answered some questions forthrightly but evaded others. It may find an answer convincing and truthful in written form that may have sounded unreliable at the time it was given. A well-phrased sentence in the record may have seemed rehearsed at the trial. A clumsy sentence in the record may not convey the ring of truth that attended it when the witness groped his way to its articulation.' (Traynor, The Riddle of Harmless Error (1970) pp. 20-21; see also, *People* v. *Fries, supra,* 24 Cal.3d at p. 228.) For this court to reject the possibility that the jury might have believed appellant

would involve not only a high degree of presumption, but also, in certain respects, an invasion of the province of the jury. By refusing to indulge in speculation, this court preserves the right of every accused person to present his version of the case to the jury. [¶] This court, therefore, has no basis for concluding that appellant's testimony would not have affected the result of the trial. '[E]rrors at a trial that deprive a litigant of the opportunity to present his version of the case . . . are . . . ordinarily reversible, since there is no way of evaluating whether or not they affected the judgment.' (Traynor, *op. cit. supra,* at p. 68.) A conviction under such circumstances is a 'miscarriage of justice' within the meaning of article VI, section 13 of the California Constitution. [Citations.]"

The majority circumvents *Spearman* by speculating as to what appellant's testimony might have been and declaring that "defendant Fisher's testimony could not have affected the result of the trial . . . ." (Majority opn., *ante,* p. 837.) The majority's conclusion that the prosecution case is "overwhelming" is based entirely on its determination that Henry Parker and Andree DeVeres are more credible than Alvines Richards and Olivia Verrett. Thus the majority indulges in speculation and credibility assessments, both of which are directly contrary to *Spearman.*

The facts of this case demonstrate the inherent inadequacy of attempting credibility determinations on the basis of selected pieces of a trial transcript. The majority omits discussion of the impeachment of the witnesses whose testimony it finds overwhelming. Henry Parker's initial description to police of his assailant did not match appellant in several significant aspects, and Mr. Parker did not tell police that he knew his assailant until later after he had conducted his own "investigation."

Appellant was apparently known to Mr. Parker primarily as the person who reputedly had pulled a gun during a dispute several weeks earlier with Tony DeVeres, a friend of Mr. Parker. Tony DeVeres was the husband of Andree DeVeres, the only other witness who testified that appellant was at Snappy's Liquor Store. Although Ms. DeVeres testified that she spoke at close range with appellant for 30 to 60 minutes, she also testified that she never saw the combination shotgun and rifle that Mr. Parker claimed appellant had used. Ms. DeVeres had earlier told a police officer a different version, one that corroborated Mr. Parker's testimony, but she testified at trial that the earlier statement was not what she had actually seen. She acknowledged that she was "high" on alcohol at the time of the robbery. Since the robbery she had been charged with a felony narcotic violation which was pending at the time of her testimony. Henry Parker acknowledged that he had lied under oath at the preliminary hearing when he testified that he had not been drinking at the time of the incident. Terrence

Melton, the store employee who testified that he saw a white-haired person running away from Mr. Parker, also testified that he was a friend of Mr. Parker and acknowledged that he had originally told the police that he did not see anyone else when he came out to help Mr. Parker. An appellate court has no way of assessing the impact of these inconsistencies and inferences of bias.

When a defendant is improperly prevented from testifying, reversal of a resultant criminal conviction is generally required unless the prosecution case is "irrebuttable." (*People* v. *Spearman, supra,* 25 Cal.3d at p. 118.) The majority avoids this result by adopting an exception for cases in which other defense witnesses testify. The testimony of alibi witnesses is not an adequate substitute for the defendant's own testimony. Appellant was the only witness who could testify not only as to his own whereabouts and activities at the time of the incident, but also as to his prior relationship with the prosecution witnesses. We cannot know what the jury's verdict would have been if the testimony of Alvines Richards and Olivia Verrett had merely corroborated appellant's own testimony, rather than constituting the entire defense.

The majority's reliance upon *People* v. *Betts* (1980) 110 Cal.App.3d 225, [167 Cal.Rptr. 768], *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669], and *People* v. *Lassell* (1980) 108 Cal.App.3d 720 [166 Cal.Rptr. 678] is misplaced. None of these cases concerns the prejudice to a defendant who elects not to testify following the erroneous denial of his *Beagle* motion. *People* v. *Betts, supra,* 110 Cal.App.3d 225, concerns the impact of improper impeachment of a defendant who has testified. In both *People* v. *Anjell, supra,* 100 Cal.App.3d at pages 197-199, and *People* v. *Lassell, supra,* 108 Cal.App.3d at pages 730-731, the court reviewed the impact of the defendant's failure to testify as one factor leading to the conclusion that the trial court properly exercised its discretion to deny the *Beagle* motion. Here the majority agrees that denial of the *Beagle* motion was error. Thus, *Betts, Anjell,* and *Lassell* are of no assistance in determining whether the error was prejudicial. That question must be resolved by following the standard articulated in *People* v. *Spearman, supra,* 25 Cal.3d 107.

"Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court. [Citations.]" (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) I must express my heartfelt distress over my esteemed colleagues' apparent refusal to be governed by the rule of law which requires all of us to conform to the decisions of our Supreme Court. I simply cannot accept the premise

that the majority's position results from a difference of opinion as to the holding in *Spearman*. Rather, it can only result from the majority's disagreement with the Supreme Court's holding in that case and in *People* v. *Barrick, People* v. *Fries,* and *People* v. *Rist.* Such blatant disregard of a higher court's rulings encourages trial court error, which in turn causes the proliferation of appeals about which my colleagues so frequently complain.