[No. A023558. First Dist., Div. Five. Jan. 23, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
BOBBY JOE PICKETT, Defendant and Appellant.

COUNSEL

James Kyle Gee, under appointment by the Court of Appeal, and Henrikson & Gee for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Linda Ludlow and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, J.**\*—Defendant Bobby Joe Pickett appeals from a judgment of conviction based upon: (1) a jury verdict finding him guilty of the first degree murder of his wife (Pen. Code, §§ 187, 189),[1] and (2) a finding by the court that he was previously convicted of a violent felony (§ 667.5, subd. (a)). The primary issue on appeal is whether it was reversible error to rule that if defendant testified the prosecutor would be allowed to impeach him with a 1971 conviction of the identical offense. It was.

### Facts

Defendant and his wife, JoAnn Pickett, separated in May 1981.[2] Defendant left California for a job in Wyoming; Mrs. Pickett continued to reside at 1714 Third Street in Richmond. On Monday, September 14, Naomi Pickett received a telephone call from her brother, defendant, who described his good construction job in Wyoming, asked about Mrs. Pickett and her children, and mentioned that he hoped to come visit the following weekend if

---

*Assigned by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]Unless otherwise indicated, all dates refer to 1981.

his work schedule allowed. At approximately 7 p.m. that next Saturday, September 19, defendant arrived unexpectedly at his sister's house, which is about three miles from Mrs. Pickett's residence.

Naomi Pickett testified that when defendant left California he looked like "a bum" but upon his return on September 21 he was clean and well-groomed. She noticed that he wore new cowboy boots. Defendant told his sister that he had been trying to locate Mrs. Pickett to give her money for the Moped bike her eldest son wanted. He also inquired whether Mrs. Pickett was still working and expressed concern as to whether she was properly caring for her children. According to Naomi Pickett defendant then informed her that earlier that day he had gotten his wife fired from her job at the Caravan Motel and barred from Minnie Lou's, a tavern she frequented and of which defendant disapproved. Defendant also reportedly asked his sister whether Mrs. Pickett had a boyfriend and stated that he would cease sending her money if she was giving it to another man. Naomi Pickett testified that defendant stated that if he ever caught her with another man he would get both of them; he would "fuck her up."

Naomi Pickett responded that Mrs. Pickett had no boyfriend but just a friend, referring to a John Burrell. She counseled defendant to leave Mrs. Pickett alone since she was now settled into a good job and seemed happy. By the time her brother left she felt that he would accept her advice. When defendant left she had no fear for Mrs. Pickett's safety because she thought the matter had been resolved. She did not attach much importance to what sounded like threats of violence against Mrs. Pickett because "that was the way [defendant] usually talked."

Several times that Saturday, September 21, John Burrell tried to contact Mrs. Pickett, with whom he was having a relationship. He testified that he finally got ahold of her at Minnie Lou's, and met her there sometime between 6 and 8 p.m. Burrell stated that she was trembling and nervous, watching each person who came through the tavern door. Burrell testified that he and Mrs. Pickett left Minnie Lou's, bought some beer at a liquor store, and then drove to a hamburger stand, where they remained for one to two hours. According to Burrell they then drove to Mrs. Pickett's house, parked in her carport and sat in the car.

Burrell testified that one to one-and-one-half hours later defendant arrived and approached the parked vehicle, "hollering." Burrell stated that defendant ordered Mrs. Pickett out of the car and said, "I sneaked back in, and I caught you at last." According to Burrell defendant hit Mrs. Pickett in the jaw, knocking her up against the house. Burrell testified that defendant then asked for Mrs. Pickett's purse and ordered him to leave. He stated that he

did so because he did not wish to interfere in a marital dispute. Burrell estimated that it was about 10 p.m. when he left Mrs. Pickett's house. On cross-examination, he explained his failure to report to police the events of the previous night upon learning of Mrs. Pickett's death: "Because I was wrong in the beginning for being there with the man's wife."[3]

John Pickett, defendant's uncle, testified that sometime late that Saturday night or early the next morning he was visited by defendant, who knocked on his door repeatedly and called out his name. He did not open the door, but looked through the back window and saw defendant wearing a flowered shirt and carrying a sweater. Defendant returned approximately five minutes later—this time wearing no shirt—and again knocked on the door and called out. The door was not answered.

Sergeant Dennis Crow testified that John Pickett had earlier told him that it was between 4:30 and 5 a.m. when defendant came to his door, and that defendant wore a stained shirt.

The defense called as witnesses two of Mrs. Pickett's children by a previous marriage. Seventeen-year-old Keith Carter testified that at 7:30 p.m. that same Saturday he answered a telephone call from defendant, who sounded drunk. Defendant inquired as to the whereabouts of Keith's mother and stated that he wished to buy Keith a Moped. Keith testified that pursuant to his agreement with his mother, he refused to divulge Mrs. Pickett's location and at approximately 8:30 or 9 p.m. called her at Minnie Lou's to inform her that defendant had called. Defendant called again at approximately 10 p.m. and then around 2:30 a.m. the following morning, but Keith told him nothing.

Mrs. Pickett's daughter, Tina Carter, also testified for the defense that she received a telephone call from defendant, this one at 3:50 a.m., asking for her mother. Tina testified, as had Keith, that defendant sounded drunk. Following her mother's instructions, she gave him no information. Tina testified that she then fell back asleep, and approximately one to two hours later was awakened by the sound of her mother's voice. She looked out of the bathroom window and saw John Burrell pulling out of the driveway with his car lights off. A second person was in the front seat.

In rebuttal to Tina's testimony Sergeant Crow testified that in an interview with Tina the day her mother died she stated that defendant's telephone call came at 3:25 a.m. but said nothing about seeing Burrell's vehicle pulling

---

[3]Police first interviewed Burrell on February 9, 1982, several months after Mrs. Pickett's death.

out from the driveway. He testified that in an interview months later she made no reference to the phone call but for the first time stated that she was awakened that morning by her mother's voice saying five or six times, "Stop. Quit.", and upon looking out the window saw Burrell and a second person pull out of the driveway.

Mrs. Pickett's body was found in her backyard at 8 a.m. that morning, Sunday, September 20. She had been fatally beaten and dragged from the carport into the yard. Impressions taken from the scene indicated that the assailant wore heavy boots, approximately size 12D. Introduced into evidence were defendant's cowboy boots, size 13B. Comparing the size and tread patterns, a testifying criminologist opined that the impressions he examined were made by defendant's boots.

Defendant never returned to his Wyoming job where a paycheck awaited him; he was later arrested in Minnesota.

In closing argument defense counsel raised the issues of lack of premeditation and intent, and the defense of heat of passion, and suggested that John Burrell may have been Mrs. Pickett's assailant.

Finding some relevance but mainly under compulsion of Proposition 8, the trial court over defense objection ruled that if he testified, defendant could be impeached with evidence of his 1971 second degree murder conviction. The victim was his former wife, whom he had strangled. Defendant did not testify.[4]

### Discussion

Because the instant offense arose prior to the effective date of article I, section 28, subdivision (f),[5] the trial court erred in using it as the measure for admissibility of defendant's prior murder conviction for impeachment purposes. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].) The proper standard was the law in force at the time of the crimes, particularly *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], and its numerous progeny.

There the Supreme Court held that in deciding whether to admit into evidence a prior felony conviction to impeach the credibility of a witness

---

[4]The record indicates that the information, which contained the allegation of defendant's prior murder conviction, was never read to the jury.

[5]Article I, section 28, subdivision (f), of the California Constitution provides in pertinent part: "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding."

pursuant to Evidence Code section 788[6] the trial court must exercise its discretion under Evidence Code section 352[7] and must exclude this impeachment evidence if its probative value is outweighed by danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People* v. *Beagle, supra,* 6 Cal.3d at pp. 452-453.) In making this determination the trial court must consider: (1) whether the conviction reflects adversely on honesty or veracity; (2) the nearness or remoteness of the prior conviction; (3) the similarity between the prior conviction and the crime with which the defendant is charged; and (4) the risk the defendant does not testify out of fear of his being prejudiced because of impeachment, thereby depriving the jury of his version of the events. (*Id.,* at p. 453; see also *People* v. *Cole* (1982) 31 Cal.3d 568, 580 [183 Cal.Rptr. 350, 645 P.2d 1182].)

 The first *Beagle* factor, relevance, is met only if the prior conviction involved a dishonest act. (*People* v. *Spearman* (1979) 25 Cal.3d 107, 116 [157 Cal.Rptr. 883, 599 P.2d 74].) Since defendant's prior murder conviction was not reflective of a dishonest character (see *People* v. *Holt* (1984) 37 Cal.3d 436, 456-457 [208 Cal.Rptr. 547, 690 P.2d 1207]), on this basis alone its admission was error.

Next we note that the prior was 12 years old. While the remoteness of the prior standing alone may not compel exclusion, it does detract significantly from the impeachment value of the evidence. (See *People* v. *Antick* (1975) 15 Cal.3d 79, 99 [123 Cal.Rptr. 475, 539 P.2d 43].)

Third, the identity of the prior conviction and the charged crime counsels against its admission. Reviewing the state of the law on this point, the California Supreme Court recently observed: "Thus the rule emerges that identical prior offenses may not be used; similar prior convictions should only be used sparingly." (*People* v. *Barrick* (1982) 33 Cal.3d 115, 126

---

[6]Evidence Code section 788 provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless: [¶] (a) A pardon based on his innocence has been granted to the witness by the jurisdiction in which he was convicted. [¶] (b) A certificate of rehabilitation and pardon has been granted to the witness under the provisions of Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code. [¶] (c) The accusatory pleading against the witness has been dismissed under the provisions of Penal Code section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense. [¶] (d) The conviction was under the laws of another jurisdiction and the witness has been relieved of the penalties and disabilities arising from the conviction pursuant to a procedure substantially equivalent to that referred to in subdivision (b) or (c)."

[7]Evidence Code section 352 provides in full: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[187 Cal.Rptr. 716, 654 P.2d 1243].) Here defendant's prior murder conviction was not only legally identical to the charged offense but was factually identical: the victim in both cases was his wife. The risk of juror prejudice in such a situation is obvious.

The fourth *Beagle* factor—the importance that the defendant testify—also suggests the ruling was error. As observed in *People* v. *Fries* (1979) 24 Cal.3d 222, 228 [155 Cal.Rptr. 194, 594 P.2d 19]: "If . . . the accused elects not to testify . . . the jury is deprived of competent, probative evidence—the testimony of the accused. For example, an accused's testimony might be necessary to give a complete picture of the events, since he may be the sole witness or the defense witness with the most complete knowledge of the events underlying the charges." Further, the jury may assume a nontestifying defendant to be guilty. "The jury 'will expect the defendant to present all the evidence he can to escape conviction, and it will naturally infer that his failure to explain or deny evidence against him . . . arises from his inability to do so.'" (*People* v. *Fries, supra,* 24 Cal.3d at pp. 228-229.) Here defendant did not testify and thus had no opportunity to explain his apparently incriminating statements or to raise the possible defenses of alibi or lack of the required mental state. In such a situation the tendency to infer guilt is "'"natural and irresistible . . . and no instruction will prevent it."'" (*Id.,* at p. 229.)

To summarize: had the trial court applied the law as it stood at the time of the crimes the court would have excluded that prior for impeachment purposes because the risk of undue prejudice substantially outweighed any probative value the prior had. ■ The only remaining question is whether that error requires reversal of the judgment of conviction.

In the instant case the evidence against defendant was not "irrebuttable." (Cf. *People* v. *Spearman, supra,* 25 Cal.3d at p. 118.) Had he testified he could have denied having appeared in his wife's carport, thereby creating a credibility contest between himself and John Burrell which only the trier of fact is competent to resolve. He might also have explained away as exaggeration his apparently incriminating statements to his sister to the effect that he was going to "fuck [his wife] up" if he caught her being unfaithful, thereby casting doubt upon his premeditation. He could also have incriminated Burrell or even have admitted the acts alleged but raised the defense of lack of intent due to his intoxication or to a killing under a heat of passion.

The Supreme Court has repeatedly instructed the reviewing courts not to speculate as to the effect the defendant's testimony might have had on the jury where the defendant's refusal to testify is premised on an erroneous

*Beagle* ruling. (See *People* v. *Barrick, supra,* 33 Cal.3d at p. 130; *People* v. *Spearman, supra,* 25 Cal.3d at pp. 118-119; *People* v. *Fries, supra,* 24 Cal.3d at pp. 233-234; *People* v. *Rist* (1976) 16 Cal.3d 211, 223 [127 Cal.Rptr. 457, 545 P.2d 833].) Because this court has no basis for concluding that defendant's testimony would not have affected the result of the trial, the judgment of conviction must be reversed.

We recognize that in *People* v. *Fisher* (1984) 153 Cal.App.3d 826 [200 Cal.Rptr. 683], the Court of Appeal deviated from this approach, determined that the defendant's testimony could not have affected the result and affirmed the judgment of conviction. In reaching its conclusion of harmless error, however, the court speculated as to the content of the nonexistent testimony of the defendant and effect such testimony would have had on the jury. That approach, as pointed out by Justice Dalsimer in his dissent, ignores the specific direction against such speculation given repeatedly by the Supreme Court in *Barrick, Spearman, Fries* and *Rist.* (See *People* v. *Fisher, supra,* 153 Cal.App.3d at pp. 838-841 [dis. opn. of Dalsimer, J.].)

The judgment is reversed.

Low, P. J., and King, J., concurred.