[No. A022318. First Dist., Div. Four. June 21, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
HUGO FREDRICK FORSTER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Certified for publication except as to parts 2 and 3. (Cal. Rules of Court, rules 976(b) and 976.1.)

COUNSEL

Ephraim Margolin, Sandra Coliver and Elfriede F. Sobiloff for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ANDERSON, P. J.**—Defendant, Hugo Fredrick Forster (hereafter appellant or Forster), appeals four convictions of attempted receiving stolen property (Pen. Code,[1] §§ 664/496).

The charges against appellant grew out of transactions conducted on May 19, May 21, June 10, June 25, July 22 and August 12, 1980, where appellant purchased various gold and silver items from undercover police agents who represented that the items in question were stolen. The facts leading to appellant's conviction may be summarized as follows.

Davis Rubin, an ex-convict and old acquaintance of appellant agreed to work as a police informant in an investigation which focused on appellant's activities. The first transaction took place on May 19, 1980. On that day Detective William Curley of the San Mateo Police Department equipped Rubin with two hidden recording devices (a small Sony minirecorder and an SK-9 transmitter) and sent him to appellant's business with eight pieces of jewelry. The jewelry was not stolen; it had been donated to the police by a local jewelry store and had initials on it. Rubin told appellant that the jewelry was stolen in New York and indicated that he was awaiting another shipment of stolen items by United Parcel Service. Appellant bought the merchandise and gave Rubin a check for $280.89 and also a purchase order receipt. Appellant displayed no reluctance in buying the stolen property. The conversation between Rubin and appellant was monitored by Detective Curley, who parked across the street in an unmarked car. Curley testified that through the monitoring device, he heard Rubin say to appellant that "the property is stolen from back east and he's got some items coming and they are going to be in shortly." Curley also confirmed that at no time did appellant express any reluctance or hesitation relative to purchasing the property. Both tapes of the May 19 transaction were introduced in evidence. When Rubin left appellant's store, he handed over the check received from Forster to Officer Curley. The ensuing search of Rubin's person revealed that the jewelry was gone.

The same procedure was followed two days later, on May 21, 1980. Rubin was searched before and after the transaction. He was fitted with a

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

pocket recorder and an SK-9 transmitting device. He was given eight new fourteen carat gold rings without stones and sent to appellant's business place. In offering the rings for sale Rubin again emphasized that they were stolen, to which appellant retorted that Rubin "shouldn't talk so much." During the ensuing conversation Rubin expressed his fear that despite the great distance the FBI might trace the items. Appellant then asked if anybody knew that Rubin had them. When Rubin answered in the negative, appellant said, "Well, then nobody should ever find out." Appellant also warned Rubin that "under those circumstances, let's not mention anything to [Ms. Ellis, his secretary]." At the conclusion of the deal, appellant gave Rubin a purchase order receipt and a check in the amount of $194.10. Rubin also testified that appellant did not display any reluctance about purchasing the rings. Rubin's testimony was corroborated by Officer Curley who, similar to the first instance, monitored the May 21 transaction. Curley stated, inter alia, that he heard Rubin bring out the fact that the property was stolen from a jewelry store back east; that he was concerned that the police might find out about the matter; and also that appellant wanted to conceal the deal from his secretary. Rubin turned over the check and purchase order to the police after the transaction.

On June 10, 1980, Rubin went to appellant's shop again and sold him stolen property for $293.91. Rubin signed a purchase order receipt for that amount. Although Rubin did not recall the exact conversation with appellant, he did remember telling him that the property was stolen. Officer Bedrosian who, together with Detective Curley, supervised the controlled sales by Rubin to appellant, acknowledged at trial that the tape of the June 10, 1980, transaction was the worst in terms of quality and was a very bad recording indeed.[2]

The next two transactions on June 25, 1980, and July 22, 1980, were carried out by Heather Moser, a deputy sheriff working undercover in the special investigations unit. On June 25, 1980, at about 10:50 a.m., Moser and Rubin went to appellant's business in Belmont. Moser was introduced to appellant by Rubin as Alice Winston, a friend of Rubin. Ms. Moser carried a Fargo SK-9 transmitter on her person and her conversation in the store was monitored by the surveilling police officers parked nearby. Moser represented to appellant that the items brought for sale (a lady's ring and a broken set of silverware) were stolen and that she was employed as a housekeeper at different places and had picked up the silverware, one piece at a time, hoping the owners would not notice it. When Rubin confirmed that the property had been "taken," appellant commented to Moser that "we

---

[2]The jury which apparently placed great emphasis on the taped evidence, failed to find appellant guilty of count III involving the June 10, 1980, transaction. (See discussion, *infra*.)

will have to teach Rubin to keep his mouth shut" and that "maybe we should buy him a zipper for his mouth." Appellant also warned both Rubin and Moser not to say a word to his secretary, Kathy Ellis, because "he didn't want her to know what was going on." After weighing the silverware and the gold ring, appellant's secretary gave Moser a check for $415. While appellant first asked for Ms. Moser's driver's license, he accepted her social security number as identification.

On July 22, 1980, at around 10:30 a.m., Moser again telephoned appellant by saying that she was Alice Winston, Rubin's friend; that she had some jewelry she had taken from a man's home; that she would like to know the highest price of the two rings she had just taken; and that she would bring them into the store. Ms. Moser then set up an appointment with appellant for 11 or 11:30 a.m. Ms. Moser, wearing a transmitting device, showed up at the store bringing with her the two promised rings (a 14 carat lady's ring and an 18 carat man's lion crest ring) and sold them to appellant for the total of $156.19. She signed the purchase order as Alice Winston. Both the telephone conversation and the later deal were tape recorded and introduced in evidence.

The last transaction charged in the information took place on August 12, 1980. Detective Michael Miller, working in plainclothes, visited appellant in the afternoon of August 12. He was equipped with a mini-Sony recording device and an SK-9 transmitter which broadcast to the surveilling officers. Miller was carrying a brown shopping bag full of silverware, kitchenware and dinnerware. He introduced himself to appellant as "Mitch," a friend of Davis Rubin, referring to a phone conversation appellant had earlier with Rubin. Appellant told Miller that his secretary would take care of him. At the conclusion of the deal appellant instructed his secretary to make out the check in the name of Davis Rubin. Appellant then asked Miller to sign his name on the check. When Miller told appellant "that we had stolen these things from my neighbor and that my name couldn't be involved," appellant agreed to Miller's signing Rubin's name on the check. Miller also said to appellant that "I had another whole bag of goods that I would like to bring in, that I had to get rid of," to which appellant replied, "Okay, you can bring them in but bring your driver's license and you sign your name." Appellant then gave Miller a check for $358 for all the items sold. The prosecution introduced in evidence three tapes on the August 12 transaction: one taped by the recording device on Miller's person; the other recorded in the surveilling police car; and the third one, a tape recording made of the initial telephone call between Rubin and appellant.

Appellant, who refused to testify on his behalf (see discussion, *infra*), based his defense on alleged lack of knowledge that the property was pur-

portedly stolen and on the theory of entrapment, and presented the testimony of two witnesses to prove the same. As to the lack of knowledge Vicki Powell, an employee of appellant between March 1978 and May 1979, testified that appellant had a hearing problem and sometimes responded without hearing or understanding the questions. She also underlined that the policy of the shop was to inquire as to the source of the merchandise and to ask for at least a driver's license for identification; and that appellant purchased gold at 75 percent of the market value. Regarding entrapment, Ms. Powell stated that appellant and Rubin were "like father and son" and that Rubin came into the shop several times a week to sell property to appellant and even to have lunch with him. Ms. Powell finally opined that Rubin was a "pathological liar." Another employee of appellant, Katherine Perencin, testified that she always required a driver's license for identification and that Rubin was suspected of having stolen merchandise from the store in January of 1981.

Based upon the above facts appellant was charged with attempted receiving of stolen property from Davis Rubin on May 19, 1980 (count I), May 21, 1980 (count II), and June 10, 1980 (count III); from Heather Moser on June 25, 1980 (count IV), and July 22, 1980 (count V); and from Michael Miller on August 12, 1980 (count VI). After trial the jury returned verdicts finding appellant guilty as charged in counts I, II, IV and VI and not guilty as to counts III and V. Following a hearing the trial court suspended the imposition of sentence and placed appellant on probation for three years with certain conditions. This appeal followed.

Appellant's primary contentions on appeal are that the trial court committed prejudicial error (1) by ruling that his 1977 federal conviction for receiving stolen property was admissible for impeachment purposes (*People v. Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]); and (2) by excluding expert linguistic testimony regarding analysis of the tapes and in refusing to admit psychiatric testimony as to the defense of entrapment. In addition, appellant maintains that (3) the trial court erred in admitting the tapes in evidence, in failing to give the requested jury instructions on entrapment and by refusing to admit the negative result of the search of appellant's premises. We find no merit to any of these contentions and affirm the judgment.

## I. *Beagle Error*

After the prosecution had rested its case and appellant had presented his witnesses, the trial court ruled that appellant could be impeached by a 1977 federal felony conviction for transportation of stolen property (gold) if he testified on his own behalf. While the trial court felt that the prejudicial

effect of the prior outweighed its probative value, it believed that the admission of the prior was mandatory under Proposition 8 (Cal. Const., art. I, § 28).[3] ■ Appellant contends that the admission of the prior constituted reversible error because (1) it was identical to the new offenses charged and (2) appellant was deterred from testifying on his behalf. (*People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243]; *People* v. *Spearman* (1979) 25 Cal.3d 107 [157 Cal.Rptr. 883, 599 P.2d 74]; *People* v. *Fries* (1979) 24 Cal.3d 222 [155 Cal.Rptr. 194, 594 P.2d 19].)

The first part of appellant's contention that the admission of the prior was erroneous, is well taken. In *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149], our Supreme Court held that "Proposition 8 applies only to prosecutions for crimes committed on or after its effective date." Since the offenses committed by appellant occurred in 1980, well before June 9, 1982, the effective date of Proposition 8, the trial court's decision to apply Proposition 8 to the instant case was clearly improper. Furthermore, the ruling of the trial court was erroneous under the balancing test set out in *Beagle* and its progeny (i.e., the law applicable at the time of the commission of the offenses) inasmuch as the prior was identical to the offenses charged and appellant was deterred from testifying on his behalf for fear of impeachment. (*People* v. *Barrick, supra,* 33 Cal.3d 115; *People* v. *Spearman, supra,* 25 Cal.3d 107; *People* v. *Fries, supra,* 24 Cal.3d 222.) Nonetheless, we conclude that the error in this case was not prejudicial requiring a reversal of the conviction.

■ California Constitution, article VI, section 13, provides that "*No judgment shall be set aside,* or new trial granted, in any cause, *on the ground of* misdirection of the jury, or of *the improper admission* or rejection *of evidence,* or for any error as to any matter of pleading, or for any error as to any matter of procedure, *unless,* after an examination of the entire cause, including the evidence, the court shall be of the opinion that *the error* complained of *has resulted in a miscarriage of justice.*" (Italics added.) ■ As the case law explains, miscarriage of justice occurs if based upon the entire record the court concludes that it is reasonably probable that a result more favorable to appellant would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) ■ Consistent therewith, the cases dealing with improper admission of prior felony convictions for impeachment purposes unanimously hold that the so-called *Beagle* error is not prejudicial per se, but

---

[3]Article I, section 28, subdivision (f) of the California Constitution provides in pertinent part: "*Any prior felony conviction* of any person in any criminal proceeding, whether adult or juvenile, *shall* subsequently *be used without limitation for purposes of impeachment . . .* in any criminal proceeding." (Italics added.)

rather subject to the harmless error rule set out in *Watson;* and that the judgment of conviction will be reversed on that ground only if in light of the record as a whole, a more favorable verdict to the defendant would have been reached. *(People v. Barrick, supra,* 33 Cal.3d at p. 130; *People v. Spearman, supra,* 25 Cal.3d at p. 118; *People v. Fries, supra,* 24 Cal.3d at p. 234; see also *People v. Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]; *People v. Betts* (1980) 110 Cal.App.3d 225, 231 [167 Cal.Rptr. 768].) The very same principle obtains where, as here, the *Beagle* error has resulted in a refusal of the defendant to testify. Although in such an instance the evaluation of the prejudicial effect of the error is more difficult because in many cases there is no clue as to what the defendant's testimony would have been had he testified *(People v. Barrick, supra,* 33 Cal.3d 115; *People v. Spearman, supra,* 25 Cal.3d 107; *People v. Fries, supra,* 24 Cal.3d 222), nonetheless the harmless error test applies and the judgment must be affirmed if the evidence against the defendant is so airtight and convincing that it is all but obvious that any testimony by the defendant would not have affected the outcome of his trial. *(People v. Fisher* (1984) 153 Cal.App.3d 826 [200 Cal.Rptr. 683]; *People v. Logan* (1982) 131 Cal.App.3d 575 [182 Cal.Rptr. 543]; *People v. Betts, supra,* 110 Cal.App.3d 225; *People v. McFarland* (1980) 108 Cal.App.3d 211 [166 Cal.Rptr. 429].)

▆▆ The case at bench falls squarely within the latter category of cases. The record of direct and circumstantial evidence unerringly demonstrates appellant's guilt. For a period from May 19 to August 12, 1980, appellant had been systematically and knowingly engaged in buying stolen gold and silverware from purported thieves and melting down the gold and silver artifacts to eliminate the possibility of being traced. The proof that such purchases took place is not only overwhelming, but beyond any dispute.

The undercover agents who participated in the transactions under controlled circumstances (i.e., under surveillance of the police) obtained purchase order receipts as well as checks from appellant. Both the purchase orders and checks were introduced in evidence. Appellant's knowledge of the stolen nature of the property was likewise supported beyond a scintilla of doubt. First of all, appellant knew that he was dealing with thieves or purported thieves. Rubin's criminal record as a burglar and thief had been well known by him. Moreover, on all three occasions when Rubin sold appellant the merchandise Rubin explicitly stated that the items had been stolen from the east coast and he expressed his concern that despite the long distance the FBI might trace the goods. Ms. Moser, the other undercover agent who was introduced to appellant as Rubin's girlfriend, posed as a housekeeper who stole the gold and silverware from various households where she was purportedly employed. Although the purchase price for the

merchandise was in excess of $400 in the first instance and about $150 the second time, appellant did not insist on a true identification (i.e., driver's license) but accepted her social security number instead. Detective Miller, the third undercover agent, also came upon Rubin's recommendation. Just as the others, he too, emphasized to appellant that the items offered for sale were stolen and he, too, refused to sign his own name on the check in order to avoid detection. Appellant nonetheless completed the deal and permitted Miller to sign Rubin's name on the check. Furthermore, appellant tried to hide the true nature of the transactions from his secretary and admonished his customers not to reveal the stolen nature of goods to her.

The above crucial facts were proven by a variety of testimonial and documentary evidence, i.e., the testimony of the percipient witnesses, Rubin, Moser and Miller; the testimony of the police officers Curley and Bedrosian who listened in on the transactions and monitored the taped conversations between appellant and their fellow agents; the tape recordings which accompanied all the transactions; and the purchase orders and checks. (See discussion, *supra.*)

In light of this overwhelming and irrefutable evidence appellant's defense was doomed to sure failure. His contention that he did not know that the property was stolen was totally rebuked by the testimonies of percipient witnesses, the police officers, and the tape recordings—all of which proved beyond any dispute that he was advised in each instance of the stolen nature of the property. (See detailed statement of facts, *supra.*) The defense of entrapment was likewise discredited by the prosecution evidence showing that appellant was engaged in a pattern of criminal conduct in buying stolen property from thieves and other criminals for an extended period of time; that in an apparent attempt to eliminate the trace of the crimes, he melted down the gold and silver artifacts; and that he displayed no reluctance in buying the purportedly stolen property in any of the instances charged. It is thus virtually certain that no amount of efforts on appellant's part (including his potential trial testimony) would have been sufficient to overcome the airtight proof of guilt presented by the prosecution. In sum, the charge that appellant committed receiving stolen property was proved by overwhelming evidence consisting of unchallenged facts, multiple percipient witnesses and unmovable hard nontestimonial evidence. Consequently, the *Beagle* error here does not compel a reversal of the conviction.

II. *Exclusion of Expert Testimony**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

The judgment is affirmed.

---

*Part 2 of this opinion is not certified for publication. (See fn., *ante,* at p. 519.)

Sabraw, J., concurred.

**POCHÉ, J.**—I respectfully dissent.

In the past, I have made quite clear my view on the standard of prejudice to be applied for *Beagle*[1] error where the defendant does not testify. (See *People* v. *Pickett* (1985) 163 Cal.App.3d 1042, 1049-1050 [210 Cal.Rptr. 85].) Nothing in the majority opinion convinces me that I was wrong then or wrong now for holding the view that the California Supreme Court has removed the power of the appellate courts to speculate as to the effect the defendant's testimony would have had on the jury where his refusal to testify is premised on an erroneous *Beagle* ruling.[2] Therefore, I would reverse the judgment of conviction.

A petition for a rehearing was denied July 16, 1985, and appellant's petition for review by the Supreme Court was denied October 3, 1985. Bird, C. J., Broussard, J., and Reynoso, J., were of the opinion that the petition should be granted.

---

[1]*People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].

[2]*People* v. *Fisher* (1984) 153 Cal.App.3d 826 [200 Cal.Rptr. 683], on which the majority relies, is wrong, plain and simple, for the reasons I set forth in *People* v. *Pickett, supra,* 163 Cal.App.3d at page 1050.